COMMODITY FUTURES TRADING COMMISSION, Plaintiff,

v.

IBS, INC. (A North Carolina Corp.), et al., Defendants,

International Bullion Services (Bahamas), Inc. (A Bahamas Corp.), et al., Relief Defendants.

No. Civ. 3:00CV103–V.

United States District Court,
W.D. North Carolina,
Charlotte Division.

June 20, 2000.

Daniel R. Salsburg, Joseph Konizeski Lawrence H. Norton, Commodity Futures Trading Comm'n, Div. of Enforcement, Washington, DC, Jodi Siff, Commodity Futures Trading Comm'n, Washington, DC, for Plaintiff.

Lawrence W. Hewitt, James, McElroy & Diehl, Charlotte, NC, for Defendnat Alan Stein.

Alan Stein, Charlotte, NC, pro se.

David C. Keesler, Moore & Van Allen, Charlotte, NC, for Defendant Joseph Finateri.

Joseph Finateri, Fort Mill, SC, pro se.

Michael Temple, Charlotte, NC, pro se.

R. Lawrence Bonner, Homer, Bonner & Delgado, P.A., Miami, FL, for Defendants Kimberlynn Creek Ranch, Inc., Kingsfield Racing, Inc., Samuel Kingsfield, Pamela Kingsfield.

## MEMORANDUM & ORDER

VOORHEES, District Judge.

**THIS MATTER** is before the Court on the following motions:

(1) The Commodity Futures Trading Commission's motion for a preliminary injunction (doc. 4);

(2) Defendants Joseph Finateri and Alan Stein's Motion to Dismiss or in the Alternative Motion for Summary Judgment (doc. 36); and

(3) Relief Defendants Kimberlynn Creek Ranch, Inc., Kingsfield Racing, Inc., Samuel Kingsfield and Pamela Kingsfield's Motion to Vacate Ex–Parte Statutory Restraining Order, which incorporates said Relief Defendants' motion to dismiss for lack of subject matter jurisdiction and motion to dismiss for lack of personal jurisdiction, and said Relief

Defendants' Answer, which re-states the above-referenced motions. (Docs. 57 & 75).

## I. PROCEDURAL HISTORY

On March 13, 2000, the Commodity Futures Trading Commission ("the Commission") filed a Complaint seeking permanent injunctive and other relief and an *ex parte* motion for a statutory/temporary restraining order. The Commission's Complaint alleges that certain business entities and persons have violated the Commodity Exchange Act by fraudulently telemarketing illegal futures contracts for precious metals and other commodities from offices located in North Carolina and elsewhere. (Compl. at ¶ 1). In Count One, the Commission alleges that Defendants' practices include "a wide range of misrepresentations and omissions concerning facts that are material to the investment decisions of customers and potential customers in violation of Section 4(b) of the Act, 7 U.S.C. § 6(b)." (*Id.* at ¶¶ 57–60). Count Two alleges that Defendants offered and dealt in illegal contracts for the purchase or sale of a commodity for future delivery, such transactions having been conducted off a board of trade and not through a member of a designated contract market, in violation of Section 4(a) of the Act, 7 U.S.C. § 6(a). (*Id.* at ¶¶ 61–65). Count Three seeks the disgorgement of funds and assets that are held by the named Relief Defendants and are traceable to Defendants' fraud. (*Id.* at ¶¶ 66–71).

On March 13, 2000, the Court granted the Commission's Emergency *Ex Parte* Motion for a Statutory Restraining Order on the basis of the supporting affidavits and documents filed therewith. The Court's Statutory Restraining Order, issued on an *ex parte* basis in compliance with the exception noted within 7 U.S.C. § 13a–1(a), prohibited the Defendants from destroying, altering, or disposing of all books, records, documents, and accounts related to the alleged illegal activity. Consistent with the requirements of

§ 13a–1(a), the Order appointed a temporary receiver to administer the restraining order and perform certain duties vital to such role as outlined fully therein.

Upon an agreement reached between the Commission and the previous counsel for Defendants Stein, Finateri, and Temple, the show cause hearing on the preliminary injunction was delayed until April 7, 2000. At that time, the matter was continued on the joint motion of Defendants and re-set for April 19, 2000. At the hearing on April 19, the Court denied Defendants' Motion to Stay All Proceedings pending the resolution of a potential criminal investigation in the matter. Thereafter, the Court received into evidence the exhibits and affidavits filed previously by the Commission, consisting of three volumes filed March 13, 2000, and the Affidavit of Mary Kaminski, filed April 5, 2000. In opposition to the preliminary injunction motion, Defendant Finateri testified on his own behalf. Due to time limitations, the hearing was continued until April 26, 2000. At that time, Defendant Finateri concluded his presentation of evidence, submitting an affidavit from an investor named David Schwanke and, over an objection by the Commission, an unsworn statement by an investor named Bernard Brauns. Defendant Stein chose not to offer any evidence in opposition to the Commission's motion.

At the April 26, 2000 hearings, attorney Lawrence Bonner entered what he termed was a "special appearance" on behalf of his clients, Samuel and Pamela Kingsfield. Kimberlynn Creek Ranch, and Kingsfield Racing. As of the date of the hearings, these Relief Defendants had not been served with process and were not parties to the case. Upon inquiry by the Court of the Commission's attempts to effect service of process on the Kingsfields, Jodi Siff, lead attorney for the Commission, informed the Court that attempts were being made to locate and contact the Kingsfields, but that their exact whereabouts were unknown. Mr. Bonner represented to the Court that he had not been authorized by his clients to accept service of process on their behalf, but that he would attempt to communicate with them to facilitate them being brought into the case as soon as possible so that they could protect their interests. The Court specifically advised Mr. Bonner that it was not aware of the precise distinction between a special and general appearance and advised Mr. Bonner that he could participate in the hearings if he wished, but that so doing might effect a waiver of personal service of process. At the conclusion of the evidence as to the motion for preliminary injunctions against the Defendants, Mr. Bonner addressed the Court at length, arguing in support of Defendants Finateri and Stein's motion to dismiss for a lack of subject matter jurisdiction.

On May 3, 2000, Mr. Bonner filed a Notice of Appearance on behalf of Relief Defendants Samuel and Pamela Kingsfield, Kimberlynn Creek Ranch, and Kingsfield Racing. These Relief Defendants also filed a Waiver of Service and a motion to vacate the Statutory Restraining Order on that date. The hearing on the Commission's motion for a preliminary injunction as to the Relief Defendants and the Relief Defendants' motion to vacate was held on May 12, 2000 in the Charlotte Division.

On May 8, 2000, Defendants Stein and Finateri requested additional time to submit documentary evidence in this matter based on the difficulty of obtaining copies of their records from the FBI. This request was granted and Defendants filed additional documentary evidence on May 25, 2000. The Commission responded on June 2, 2000.

## II. FACTUAL FINDINGS

On September 1, 1991, Defendant Joe Miller Company, Inc., filed a Fictitious Business Name Statement with the State of California to do business as IMC Trading, Inc ("IMC–CA"). (CFTC Exh. 104 at 6). The statement identifies Defendant Joseph Finateri as the company's president and designates Richard Stambul as

the registered agent for service. (*Id.;* Pl. Exh. 119 at 2). IMC–CA operated in California for approximately three years, during which time it sold highly-leveraged investments in precious metals through its telemarketing operations. (Pl.Exh. 104 at 60, 73). In April 1995, Richard Stambul incorporated IMC Trading, Inc. to do business in the State of Nevada ("IMC–NV") with Joe Finateri designated as the sole director of the company. (Pl.Exh. 115 at 1). IMC–NV operated in Nevada for approximately three-and-a-half years, offering highly-leveraged precious metals contracts through its telemarketing operations. (Pl.Exh. 101 at ¶ 9, Pl.Exh. 102). In October 1998, John Nelson of the Securities Division of the Office of the Secretary of State for the State of Nevada began investigating a complaint the Division received concerning the business practices of IMC–NV. (Pl.Exh. 102 at ¶ 4). Through his investigation, Nelson determined that IMC–NV was not registered with either the National Futures Association or the State of Nevada to sell commodities. (*Id.* at ¶¶ 5–8). Nelson's investigation of IMC–NV eventually led to the entry of a non-consensual Permanent Order to Cease and Desist on December 17, 1998 to prevent IMC–NV from doing further business in Nevada. (*Id.* at ¶¶ 9–16).

In the late-summer or early-fall of 1998, IMC Trading, Inc. began operating out of offices in Arizona ("IMC–AZ"). (Pl.Exh. 111 at 26; Pl.Exh. 116). A Profit Certificate of Disclosure was filed with the Arizona Corporation Commission by Richard Stambul on behalf of IMC–AZ (*Id.*). On September 10, 1998, IMC Trading, Inc. was incorporated in the State of North Carolina ("IMC–NC") by Richard Stambul, (Pl.Exh. 112 at 1), and on April 8, 1999. Richard Stambul incorporated IBS, Inc. in North Carolina ("IBS–NC"). (Pl. Exh. 113 at 1). IBS–NC shares office space with Pinpoint Marketing, Ltd., a Florida corporation operated by the Mazuma Trading Group, Inc. (Pl.Exh. 101 at ¶¶ 11, 14, 20).

IMC–NC, IBS–NC, IMC–NV, and IMC–AZ have all been incorporated by Richard Stambul and Stambul served as the registered agent for IMC–CA. (Pl. Exh. 113 at 3; Pl.Exh. 115; Pl.Exh. 116 at 1; Pl.Exh. 119 at 2). Finateri is the sole officer of IMC–NV and IMC–CA and an officer of IMC–AZ. (Pl.Exh. 115; Pl.Exh. 119 at 2; Pl.Exh. 116 at 3). Stein is an officer of IMC–AZ and purports to be Controller of IMC–CA and IMC–NV. (Pl. Exh. 116 at 3; Pl.Exh. 102 at 34, 38; Pl.Exh. 104 at 174). Stein also purports to be the president of Pinpoint and a director of IMC–NC. (Pl.Exh. 124 at 4; Pl.Exh. 101 at ¶ 14). The Articles of Incorporation for both IMC–NC and IBS–NC do not reflect the names of any officers or directors. (Pl.Exh. 112 at 3; Pl.Exh. 113 at 3). Michael Temple is an employee of IMC–CA, IMC–NV, IMC–AZ, and IBS–NC, working primarily in the role of a telemarketer and soliciting customers for the companies. (Pl.Exh. 101 at ¶ 15). Finateri also solicited customers for IMC–NV, IMC–AZ, and IBS–NC. (*Id.*).

There is a significant amount of financial overlap between IBS–NC, Pinpoint Marketing, and IMC–NV. Throughout 1999, IBS–NC paid Pinpoint large sums of money for "labor" and "training" and paid Pinpoint's rent on the office space the two companies shared on several occasions. (Pl.Exh. 101 at ¶ 16). Beginning in June 1999, IBS–NC assumed the payments on certain credit card accounts and car leases previously held by IMC–NV. (*Id.* at 18).

The evidence also reveals a significant number of transactions between a number of foreign and domestic bank accounts held by the various Defendants and Relief Defendants. Based on an analysis of records seized from the offices of IBS/Pinpoint in Charlotte, Mary Kaminski compiled a chart tracing the flow of funds between accounts controlled by the various individuals and entities. These accounts were identified as follows:

(1) Three Bahamian accounts in the names of IBS, DBS, and GBX respectively at Barclays Bank and an account in the name of IBS at CIBC Bank. Two Canadian accounts in the names of GBX at RBC Dominion Securities and an account in the name of Johnson Matthey IBS. Three accounts in the United States in the names of Pinpoint Marketing, AJS Enterprises, Inc. and Alan Stein respectively. The records reflect that these accounts were controlled in whole or in part by Alan Stein. The main account into which customer funds are deposited is the IBS account and Barclays Bank. (Kaminski Aff. at ¶ 10, Att. 4 at 1; S. Kingsfield Test., 5/12/00 at ___).

(2) A Bahamian account in the name of Van Koningsveld at Barclays Bank. A Canadian account in the name of Van Koningsveld with RBC Dominion Securities. Two accounts in the United States in the name of Kimberlynn Creek Ranch and Samuel Kingsfield respectively. These accounts were controlled in whole or in part by Samuel Kingsfield. There were also two accounts in the United States in the name of Kingsfield Racing and Pamela Kingsfield respectively. These accounts were controlled in whole or in part by Pamela Kingsfield.

(3) A Bahamian account in the name of the Joe Miller Company with Barclays Bank. An account in the United States in the name of Joseph and Darlene Finateri. These accounts were controlled in whole or in part by Joseph Finateri.

(4) Two accounts in the United States in the names of FX & B, LLC and Michael Temple respectively. These accounts were controlled in whole or in part by Michael Temple.

(Kaminski Aff. 4/5/00 at Exh. 4). The evidence reviewed and summarized through the Kaminski Affidavit establishes that several million dollars worth of funds were transferred between these accounts between April 1998 and March 2000. (*Id.*

at ¶ 10). Customer funds were deposited directly into an IBS account with Barclays Bank in the Bahamas and controlled in whole or in part by Alan Stein. (*Id.;* Exh. 4). From this account, funds flowed out to a number of accounts, including most significantly the GBX account with Barclays and controlled by Stein, the IBS account at CIBC, the DBS account with Barclays and controlled by Stein, the Von Koningsveld account with Barclays controlled by Samuel Kingsfield, and the IBS–NC account. (*Id.;* Exh. 4). From records relating specifically to the IBS–Bahamas account with Barclays bank, the GBX account with Barclays bank, and the IBS account with CIBC, the Commission was able to trace funds flowing to the following Defendants and Relief Defendants or accounts held in whole or in part by them:

| | |
|---|---|
| AJS Enterprises: | $115,927.00 |
| DBS: | $106,239.00 |
| FX & B: | $ 24,301.00 |
| GBX: | $739,000.00 |
| IBS–Bahamas: | $101,680.00 |
| IBS–NC: | $138,000.00 |
| Finateri: | $167,404.00 |
| Joe Miller Co.: | $367,244.00 |
| S. Kingsfield: | $729,854.00 |
| (Von Koningsveld acct.) | |
| Kingsfield Racing: | $178,000.00 (from S. Kingsfield) |
| Kimberlynn Creek: | $152,000.00 |
| Stein: | $ 9,000.00 |
| Temple: | $ 9,697.00 |

(*Id.* at ¶ 10). These amounts are in addition to the amounts identified by Ms. Kaminski in a previous affidavit, in which she identified the following amounts of customer funds transferred to Defendants and Relief Defendants:

| | |
|---|---|
| Finateri: | $754,960.00 |
| Kimberlynn Creek: | $853,474.00 |
| Kingsfield Racing: | $ 37,192.00 |
| S. Kingsfield: | $ 61,058.00 |
| P. Kingsfield: | $397,708.00 |
| Temple: | $ 30,869.00 |
| FX & B: | $180,558.00 |
| Stein: | $114,918.00 |
| AJS Enterprises: | $150,454.00 |

(Pl.Exh. 101 at ¶ 31; Pl.Exh. 125 at ¶ 1). The Commission's evidence also establishes that various Defendants and Relief Defendants diverted customer funds to pay for personal expenses and that several persons held credit cards drawn off IMC accounts. (*Id.* at ¶¶ 32–35).

Based on the records reviewed by Ms. Kaminski, she states in her affidavit that there should be $5,209,748.72 of equity held by IMC/IBS for its 365 customers and that if the commodities are actually held by IBS, there should be $23,788,806.94 worth of physical commodities in storage. (Kaminski Aff. 4/5/00 at ¶ 11). These records relate to transactions and accounts from 1998 through March 2000. No evidence was presented regarding accounts or transactions entered into previous to this time period by IMC–NV or the other corporate entities.

As for the actual operation of the individual and corporate Defendants, the evidence presented by the Commission establishes that IMC–NV actively solicited customers through a number of representatives, including Samuel Kingsfield in 1996, Joseph Finateri in 1996 through 1998, and through Michael Temple in 1997 and 1998. (Pl.Exh. 103 at 49; Pl.Exh. 105 at ¶¶ 2, 18, 25). IMC–NV also solicited customers through a number of other employees, including Robert Dollinger and David Lewandowski between 1996 and 1998. Bill Brannon in 1997, Christopher Layton in 1998, and at various times through salespersons Joseph Pinto, Donna Hyatt, Steve Mayzick, Daniel Sammarone, David Secoy, Candice Angelo, Robert Coffin, Christopher Donovan. Mark Kostner, Geralyn Johnson, and Barry McCullers. (Pl.Exh. 102 at 5–13; Pl.Exh. 103 at 49,65, 75, 84; Pl.Exh. 106 at ¶ 2; Pl.Exh. 107 at ¶ 2; Pl.Exh. 108 at ¶ 2; Pl.Exh. 109 at ¶ 2, Pl.Exh. 111 at ¶ 2). Alan Stein and Jerry Cosper also made calls on behalf of IMC–NV during this time period, indicating to customers that they were senior brokers with the company. (Pl.Exh. 108 at ¶ 18; Pl.Exh. 109 at ¶ 27; Pl.Exh. 110 at ¶ 2).

IMC–NV and IBS–NC solicited potential customers by offering them the ability to invest in precious metals with a 20–percent down payment and a loan for the remaining balance, first through Amitex Investment Services ("Amitex") and later through International Bullion Services, Bahamas ("IBS—Bahamas"). (Pl.Exh. 105 at ¶¶ 2–3 Pl.Exh. 106 at ¶ 6; Pl.Exh. 107 at ¶ 4; Pl.Exh. 108 at ¶¶ 3, 32; Pl.Exh. 109 at ¶ 3; Pl.Exh. 110 at ¶ 3; Pl.Exh. 111 at ¶ 3); (Kaminski Aff. 4/5/00, Exh. 1 at 3). IMC–NV representatives regularly told potential customers that had the individual invested the last time the representative called, the individual could have made substantial profits in the interim, anywhere from 40 to 50–percent and as high as 75–percent, even though some individuals did not recall having spoken previously to anyone from IMC–NV. (Pl.Exh. 106 at ¶¶ 2–3; Pl.Exh. 107 at ¶ 2; Pl.Exh. 108 at ¶¶ 2, 4; Pl.Exh. 110 at ¶ 2). Once a potential customer decided to invest money in a commodity through IMC–NV, they were told that Amitex and later IBS–Bahamas would store the metals and other commodities as collateral for the loan. (Pl.Exh. 105 at ¶ 3; Pl.Exh. 106 at ¶¶ 24, 33; Pl. Exh. 108 at ¶ 32). IMC–NV told potential customers that investing in silver at that time was an extraordinary opportunity as silver prices were poised to increase substantially over a short period of time. (Pl. Exh. 105 at ¶ 4; Pl.Exh. 102 at 9–10; Pl. Exh. 106 at ¶ 3; Pl.Exh. 107 at ¶ 2–3 Pl. Exh. 109 at ¶ 2; Pl.Exh. 110 at ¶ 2; Pl. Exh. 111 at ¶ 2). Even if customers declined the representative's initial solicitation, the company followed up regularly and repeatedly, continuing to tell potential customers that the price of silver would increase substantially over a short period of time and that they must invest quickly. (Pl.Exh. 105 at ¶ 5; Pl.Exh. 106 at ¶ 4; Pl.Exh. 107 at ¶¶ 3, 4; Pl.Exh. 108 at ¶ 5; Pl.Exh. 109 at ¶ 3); (Pl.Exh. 111 at ¶¶ 3, 4, 5).

When a customer decided to invest with IMC–NV, the customer was instructed to wire the investment immediately to a company bank account. (Pl.Exh. 102 at 10–11; Pl.Exh. 106 at ¶¶ 7, 20; Pl.Exh. 107 at ¶ 5; Pl.Exh. 109 at ¶ 4; Kaminski Aff. 4/5/00, Exh. 1 at 11). Only after they made their initial investment, IMC–NV sent its customers information booklets, agreements,

and risk disclosure statements. (Pl.Exh. 106 at ¶ 8; Pl.Exh. 107 at ¶¶ 6–7; Pl.Exh. 108 at ¶ 7; Pl.Exh. 109 at ¶ 5; Pl.Exh. 111 at ¶¶ 7–8). Customers also received calls from IMC–NV and later IBS–NC employees on a regular basis encouraging them to invest additional money in silver, upon representations that included that silver was at or near historic lows and would rebound sharply over a short period of time, that the stock market was extremely overpriced and that a correction would occur soon, that dollar and interest rate fears would drive silver prices higher, that the company representative had just purchased silver for his own account, and that Warren Buffet's interest in silver would drive up prices significantly. (Pl.Exh. 105 at ¶¶ 13–14, 15–16, 20–21, 25–26, 30–31; Pl.Exh. 106 at ¶¶ 3, 20, 27; Pl.Exh. 107 at ¶¶ 8, 11, 14, 18, 22–23, 25–26, 27, 30, 31, 32, 33, 34, 38, 40, 41, 42; Pl.Exh. 108 at ¶¶ 22, 24, 26, 28, 33, 49; Pl.Exh. 109 at ¶¶ 6–7, 11, 27, 30; Pl.Exh. 110 at ¶¶ 6, 60, 62; Pl.Exh. 111 at ¶¶ 9, 18, 24, 26, 35, 53).

Employees of IMC–NV regularly represented to customers that although silver prices were stagnant or had dropped recently, silver was expected to reach $10 to $15 per ounce in the upcoming months or rise to $40 to $50 per ounce in the near future. (Pl.Exh. 105 at ¶ 28; Pl.Exh. 106 at ¶¶ 3, 5, 10, 20, 27; Pl.Exh. 109 at ¶¶ 15, 17, 30; Pl.Exh. 110 at ¶ 12; Kaminski Aff. 4/5/00, Exh. 1 at 12; S. Kingsfield Test., 5/12/00 at _____). An IMC–NV employee even told one customer that silver prices could soar to as much as $400 per ounce in a matter of months. (Pl.Exh. 105 at ¶ 30). IMC–NV also regularly solicited existing customers and potential customers to invest in other commodities including gold, crude oil, heating oil, platinum, and palladium, again urging customers to act quickly due to dramatic price upswings in coming months due to factors including miners' strikes, the Asian financial crisis, the Presidential Impeachment scandal, and an impending war between the United States and Iraq. (Pl.Exh. 105 at ¶ 30–31: Pl.Exh. 106 at ¶¶ 9, 23; Pl.

Exh. 109 at ¶ 19, 25; Pl.Exh. 110 at ¶ 16, 49, 58; Pl.Exh. 111 at ¶ 16).

In some instances, customers state that they were never told that they had the option to pay for their metal in full and take delivery. (Pl.Exh. 108 at ¶ 54; Pl.Exh. 109 at ¶ 3; Pl.Exh. 110 at ¶ 3). When a customer inquired about taking delivery of his/her metal, IMC representatives strongly discouraged the customer from doing so, stating that storage and delivery costs were high and even representing to some customers that "no one takes delivery," that "it is not done that way," and that "it did not make sense to take delivery." (Pl. Exh. 106 at ¶ 13, 15, 33; Pl.Exh. 107 at 4). Both Samuel Kingsfield and Defendant Finateri stated during their direct examination that IBS was capable of delivering all metal that was sold. (Finateri Test., 4/19/00 at 89–91; S. Kingsfield Test., 5/12/00 at _____). When asked where the metal was stored, Mr. Finateri stated that he did not know, that IBS handled that aspect of the operation, and that Mr. Kingsfield would know where it was stored. (*Id.*). When Mr. Kingsfield was asked where the metal was stored, he stated that he knew IBS stored metal on behalf of customers, but that he did not know where or how much metal was stored by IBS. (S. Kingsfield Test., 5/12/00 at _____). Not a single warehouse receipt or other indication of actual purchase and storage of the metal or other commodities by IMC/IBS on behalf of customers, however, was offered into evidence by any party.

When an equity call was issued on a customer's account, thereby requiring the customer to forward funds to cover the equity call or have those positions liquidated, IMC–NV and later IBS–NC regularly encouraged customers to invest additional funds in silver or other commodities on the forecast that the market would rebound strongly in a short period of time. (Pl.Exh. 105 at ¶¶ 7–8, 11–12, 22–23, 25–29; Pl.Exh. 106 at ¶¶ 12–14, 15–16, 17–18, 19,

25–26, 31–32, 34–35, 39; Pl.Exh. 107 at ¶¶ 9–10, 12–13, 16–17, 19, 20–21, 35–36, 37–38; Pl.Exh. 108 at ¶¶ 10–11, 12–13, 14–15, 16–17, 18–19, 20–21, 29–31, 35–36, 41–42, 43, 44; Pl.Exh. 109 at ¶¶ 9–10, 13–14, 21–22, 29; Pl.Exh. 110 at ¶ 7–8, 9–11; 14–15, 20–21, 22–23, 24–25, 26–27, 28–29, 31–32, 33–34, 35–36, 37–38, 39–40, 41–42, 43–44, 51–52, 64–6566–67, 68–69; Pl.Exh. ¶¶ 11–12, 13–14, 22–23, 29–30, 31–32, 43–44, 52). IMC–NV customers were charged an administrative fee of four to five percent per transaction, a premium of $0.45 per ounce for precious metals, approximately $41 per month for storage of the metal, an interest rate as high as 10.25% on the loan through IBS, for total up-front premium fees of approaching 40–percent of a customer's initial investment. (Pl.Exh. 105 at ¶ 35; Pl.Exh. 109 at ¶ 43; Finateri Test., 4/19/00 at 95–98). On occasion, IBS–Bahamas would liquidate a portion of a customer's position in silver without first contacting the customer. (Pl.Exh. 108 at ¶¶ 38–40, 48; Pl.Exh. 109 at ¶ 32; Pl.Exh. 111 at ¶ 20, 28). When a customer expressed hesitation about investing additional funds or indicated a desire to close his/her account, another representative of IMC/IBS, often Finateri, would come on the line or return the customer's call in an attempt to ease the customer's concerns. (Pl.Exh. 106 at ¶¶ 10, 17, 22, 33, 40; Pl.Exh. 107 at ¶¶ 3, 4; Pl.Exh. 111 at ¶ 48).

In December 1998, customers received correspondence from Stein indicating that IMC–NV had been purchased by IBS. (Pl. Exh. 107 at ¶ 28; Pl.Exh. 108 at ¶ 45; Pl.Exh. 109 at ¶ 35; Pl.Exh. 110 at ¶ 78; Pl.Exh. 111 at ¶ 38). When customers attempted to call an IBS representative at a Bahamian phone number, they were told the representative was unavailable, were asked to leave a message, and then received a return phone call from the representative who stated that he was calling from the Bahamas. (Pl.Exh. 107 at ¶ 29; Pl.Exh. 108 at ¶ 46; Pl.Exh. 109 at ¶ 36; Pl.Exh. 111 at ¶ 45). The evidence shows, however, that at least some of the return phone calls were made from Charlotte, North Carolina. Evidence was also offered by the Commission, over Defendants objections, that IBS–Bahamas was a sham corporation that operated through A.S.A.P. Services, Ltd. (Pl.Exh. 101 at 23). A.S.A.P.'s web-site proclaims:

> A.S.A.P. Services Ltd. created the corporate Headquarters Program so you can prove your corporation is a legitimate Bahamas business. Tour Headquarters Program establishes a complete corporate base. You get an office building with employees [sic] that greet your corporation's visitors and handle telephone communications on a personal basis. A.S.A.P. employees are your employees when someone calls or stops in to see your company. You have a well-equipped full service mail room and private mailbox. We accept your incoming mail and handle it according to your instructions. You can send your original mailings from your Bahamas office and re-route to any destination with your Bahamas return address and a Bahamian postmark. You will have a local bank account which provides a paper trail of your business transactions in the Bahamas.

(Pl.Exh. 101 at 30; *http://www.asapbahamas.com/corp.html*). Further, the Commission's evidence also establishes a flow of funds from the central customer account belonging to IBS with Barclays bank to an A.S.A.P. account in the Bahamas and a personal account in the United States belonging to Charles E. Myers, Director of International Business for A.S.A.P. (Kaminski Aff., 4/5/00 at ¶ 10, Exh. 4).

During his testimony, Defendant Finateri stated that IBS is a wholesale business that sells precious metals through its telephone sales operation. (Trans. 4/19/00 at 44, 46). Finateri stated that he does not sell futures contracts and did not even know what one was. (*Id.* at 45). Finateri testified that IBS sells physical metal, either through full payment and delivery or with 20–percent down and an 80–percent

financing arrangement similar to a home mortgage. (*Id.* at 45, 51). Finateri identified a letter from IMC Trading, Inc. to customers stating that the company only engaged in physical purchases and did not offer securities, options, of futures trading. (*Id.* at 85). Finateri testified that he worked off a customer list of 300 to 400 business owners, at least 90–percent of whom were sophisticated investors in his opinion who understood the risk involved in the transactions. (*Id.* at 47). Finateri later stated, however, that on any given day he spoke to anywhere from 30 to 500 people a day over the phone. (*Id.* at 66).

Finateri testified that IBS is located in Nassau, Bahamas were it occupies a portion of a 20,000 square foot office building, that the company has about 15 Bahamian employees, and that he has been there personally on three occasions. (*Id.* at 48–49). Finateri stated that IBS has been in business about a decade and handles the wholesale end of the operation. (*Id.* at 49–50). Finateri testified that it is uncommon for a customer to take actual delivery of the metal upon purchase due to shipping and storage costs, but that some people have taken delivery of their metal. (*Id.* at 51). Finateri stated that he is paid on a commission basis. Although he acknowledged that certain fees including an opening fee and storage fee were associated with the transactions and were disclosed up front. Finateri stated that he was not sure because that was not the end of the deal on which he worked. (*Id.* at 52). Finateri later acknowledged on cross-examination, however, that the initial fees charged to customers totaled approximately 40–percent of their initial investment. (*Id.* at 97–98). Finateri stated that risk disclosure was part of the sales script he followed when soliciting customers. (*Id.* at 53).

In reviewing customer account statements submitted by the Commission, Finateri stated that the statements reflected the actual physical purchase of certain amounts of silver. (*Id.* at 54). Finateri stated that the purchase confirmations stated a customer's break even point, the point at which the customer broke even on his investment after the subtraction of fees and other charges. (*Id.* at 55–56). In the case of the account statement of Kevin Haybeck, Finateri stated that the break even point on a purchase of silver at $5.34 per ounce was $5.95 per ounce, meaning that silver had to increase in value over $0.60 cents an ounce for Haybeck to break even. (*Id.*). Finateri also identified the equity call amount listed on the statement, a price 5–percent below the purchase price at which the customer would be required to pay an additional amount to maintain the agreed 20–percent equity level in the purchase. (*Id.*). When an equity call was issued, meaning that the price per ounce of silver had dropped, Finateri stated that he would always recommend that the customer also buy additional ounces at the lower price to "price average down." (*Id.* at 57). Trade confirmations did not specify a delivery date on them. (*Id.* at 58).

Through Finateri's testimony, three exhibits were introduced, the first being account terms and conditions that Finateri stated were sent to all customer's after they mad their initial investment, the second being a brochure from Johnson Matthey, a refinery that generates the gold, silver, and platinum that Finateri testified was sold to customers through IBS, and the third being a risk disclosure statement that Finateri stated was mailed to customers after their initial purchase of the metals. (*Id.* at 59–61).

Finateri also reviewed a monthly account statement from Kevin Haybeck, stating that it reflected the actual amounts of metals held by the customer as of the date of the statement as well as the interest and storage fees. (*Id.* at 63–64). Finateri stated that he did not know where the metals were stored because storage was handled by IBS, but that Samuel Kingsfield would have that information. (*Id.* at 64–65). Finateri identified the section of the IBS account terms brochure

that stated that immediate home delivery, which included additional expenses for delivery and handling, was available if the customer paid the full cash value of the metal. (*Id.* at 65–66). Finateri stated that the company had the ability to make actual delivery of all metal it sold and that he never refused to deliver metals upon request or return a customer's money. (*Id.* at 89, 91). The company did not sell standardized amounts at set prices; instead selling what the customer could afford to purchase at the price set by the fluctuating market with a $1,000 minimum. (*Id.* at 89–90).

On cross-examination by the Commission, Finateri stated that he had no evidence or affidavit that IMC or IBS customers ever made a profit upon closing their account, but that he could get such evidence and that IBS was preparing those documents for submission to the Court. (*Id.* at 92–93).

Scripts of the sales pitches made by IMC–NV and IBS–NC representatives have been filed by the Commission, including scripts filed with the Nevada Department of Business and Industry and scripts seized from IBS–NC's offices. These sales scripts included a pattern statement that someone with IMC/IBS had called previously and that silver had risen substantially in the interim. (Pl.Exh. 103 at 90, 92, 93, 95; Kaminski Aff., 4/5/00, Exh. 1 at 4, 5, 12). The sales scripts filed in Nevada ask for the potential customer's permission to first send information and brochures for the customer to review. (Pl.Exh. 103 at 90, 92, 93, 95). The North Carolina scripts refer to a package that was mailed by a junior broker or one that is on the way to the potential customer. (Kaminski Aff., 4/5/00, Exh. 1 at 6). One script from the North Carolina office lists "Three Reasons Why a Steep Rise in the Price of Silver is Almost a Mathematical Certainty" and includes the statement, "At today's extremely low levels, we can safely 'hoard' silver in the futures market like millionaires collect

rental properties," with the word "futures" crossed through. (*Id.* at 9).

During his direct testimony, Samuel Kingsfield testified that he is a resident of Weldon, California and a director of IBS–Bahamas. (Trans. 5/12/00 at ____; Kingsfield Aff. at ¶ 3). He stated that it was his understanding that IBS–Bahamas sells wholesale commodities to dealers on a spot basis. (Trans. 5/12/00 at ____; Kingsfield Aff. at ¶ 3). Kingsfield testified that IBS–Bahamas in an International Business Corporation and that it's managing director is Elizabeth Higgs. (Trans. 5/12/00 at ____). Kingsfield testified that IBS used a hedge account that allowed it to service its customers needs and make delivery upon demand. (Trans. 5/12/00 at ____; Kingsfield Aff. at ¶ 6). Kingsfield stated that the hedge account was held by IBS–Bahamas' sole shareholder and parent company, GBX, Ltd, in a Canadian account through Dominion Securities. (Trans. 5/12/00 at ____). Kingsfield testified that he did not hold funds personally or in trust for any Defendant. (Trans. 5/12/00 at ____). He further testified that Pamela Kingsfield, Kimberlynn Creek Ranch, and Kingsfield Racing had no involvement in any of the activities of IBS. (Trans. 5/12/00 at ____; Kingsfield Aff. at ¶ 9).

During her testimony, Pamela Kingsfield stated that she was a resident of Weldon, California and involved with the operations of Kimberlynn Creek Ranch, Inc. and Kingsfield Racing. (Trans. 5/12/00 at ____). Mrs. Kingsfield stated that both operations were self-sustaining businesses and that she was not aware of the purpose of deposits made into corporate accounts for either company by Mr. Kingsfield, stating only, "That is what he does with his money." (*Id.*). Mrs. Kingsfield testified that she had an American Express card on a corporate account that was used for anybody who need to make travel reservations. (*Id.*).

On May 25, 2000, Defendants Stein and Finateri filed their Submission of Additional Evidence. The exhibits contained

therein consist of documents copied from Defendants' records that are now in the possession of the FBI. Defendants' Exhibit 3 contains a confirmation letter from Stein to IMC–NV customer Greg Macchiavernia date December 5, 1995 which states that Stein "shipped the last 100 ounces yesterday" to Mr. Macchiavernia. (Doc. 72, Exh. 3). Attached thereto are Parcel Shipping Orders from Mail Boxes Etc. verifying that shipment as well as a June 26, 1996 shipment of 200 ounces of silver to Mr. Macchiavernia. (*Id.*). Defendants' Exhibit 4 includes a Parcel Shipping Order from Mail Boxes Etc. showing a shipment of a total of 1,000 ounces of silver from Alan Stein to customer J. Kenneth Willison on June 26, 1996. (*Id.*, Exh. 4). Defendants' Exhibit 5 includes a Parcel Shipping Order from Mail Boxes Etc. showing a shipment of 1,000 ounces of silver bullion from IMC–NV to John J. Bonk on December 4, 1995. (*Id.*, Exh. 5). Defendants' Exhibit 6 is a Parcel Shipping Order from Mail Boxes Etc. showing a shipment of 200 ounces of silver bullion from IMC–NV to Dan Blackman on December 4, 1995. (*Id.*, Exh. 6). Defendants' Exhibit 7 is a Parcel Shipping Order from Mail Boxes Etc. showing a shipment of 1,000 total ounces of silver bullion from Alan Stein to Kenneth Reed on August 1, 1996. (*Id.*, Exh. 7). Defendants' Exhibit 10 includes a Confirmation of Delivery from United Parcel Service to Wayne Schell on September 22, 1994 (*Id.*, Exh. 10). Defendants' Exhibit 11 includes a Receipt for Insured Mail for the delivery of one ounce of gold bullion to IMC customer Robert Huang on October 17, 1994. (*Id.*, Exh. 11). Defendants' Exhibit 16 contains a letter dated April 8, 1998 from Alan Stein to Melvin Seymour, the Bahamian Director of Immigration, in which Mr. Stein states that he is the Managing Director and Secretary of IBS–Bahamas and will be the only director based in the Bahamas. (*Id.*, Exh. 16). The other exhibits submitted by Defendants include miscellaneous account statements and other documents from IMC/IBS.

## III. LEGAL ANALYSIS

The Commission alleges that pursuant to the Commodity Exchange Act,[1] this Court has jurisdiction to enjoin persons that have engaged in, are engaging in, or will engage in any act that violates any provision of the Act or other rule, regulation, or order promulgated under the Act. Title 7, Section 13a–1(a) of the United States Code states:

> Whenever it shall appear to the Commission that any contract market or other person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order thereunder, or is restraining trading in any commodity for future delivery, the Commission may bring an action in the proper district court of the United States or the proper United States court of any territory or other place subject to the jurisdiction of the United States, to enjoin such act or practice, or to enforce compliance with this chapter, or any rule, regulation or order thereunder, and said courts shall have jurisdiction to entertain such actions: Provided, That no restraining order (other than a restraining order which prohibits any person from destroying, altering or disposing of, or refusing to permit authorized representatives of the Commission to inspect, when and as requested, any books and records or other documents or which prohibits any person from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets, or other property, and other than an order appointing a temporary receiver to administer such restraining order and to perform such other duties as the court may consider appropriate) or injunction for violation

1. All references and cites to the Commodity Exchange Act will refer to the Section number as denoted in the United States Code, not the Section number of the Act.

of the provisions of this chapter shall be issued ex parte by said court.

7 U.S.C. § 13a–1(a) (1999). Section 13a–1(b) allows for the entry of a permanent or temporary injunction or restraining order without bond upon a proper showing. *Id.* at § 13a–1(b). Upon a proper showing by the Commission that established a likely violation of the Act by Defendants and liability on the part of Relief Defendants, the Court entered the Statutory Restraining Order on March 13, 2000 on an *ex parte* basis as allowed in the parenthetical exception within § 13a–1(a). In the Complaint and the memorandum in support thereof, the Commission now seeks a preliminary injunction, and ultimately a permanent injunction, against Defendants to prohibit, among other things, any future violations of the Act.

*A. Defendants' Motion to Dismiss or in the Alternative for Summary Judgment*

Defendants Finateri and Stein's motion to dismiss is made pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. As to Defendants' motion to dismiss pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction, the Fourth Circuit summarized the applicable legal standards as follows:

> When a Rule 12(b)(1) motion challenge is raised to the factual basis for subject matter jurisdiction, the burden of proving subject matter jurisdiction is on the plaintiff. *Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir.1982). In determining whether jurisdiction exists, the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment. *Id.; Trentacosta v. Frontier Pacific Aircraft Indus.,* 813 F.2d 1553, 1558 (9th Cir.1987). The district court should apply the standard applicable to a motion for summary judgment, under which the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists. *Trentacosta, supra,* 813 F.2d at 1559 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). The moving party should prevail only if the material facts are not in dispute and the moving party is entitled to prevail as a matter of law. *Trentacosta, supra,* 813 F.2d at 1558.

*Richmond, Fredericksburg & Potomac Railroad Co. v. United States,* 945 F.2d 765, 768 (4th Cir.1991).

Defendants' motion is also made pursuant to Rule 12(b)(6) for failure to state a claim on which relief may be granted. A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint and does not resolve contests concerning the facts, the merits of claims or the applicability of defenses. *See Randall v. United States,* 30 F.3d 518, 522 (4th Cir.1994); *see also Republican Party of North Carolina v. Martin,* 980 F.2d 943, 952 (4th Cir.), *cert. denied,* 510 U.S. 828, 114 S.Ct. 93, 126 L.Ed.2d 60 (1993). Such motions "should be granted only in very limited circumstances," *Rogers v. Jefferson–Pilot Life Ins. Co.,* 883 F.2d 324, 325 (4th Cir.1989), and a complaint will survive as long as it sets out sufficient facts for the court to infer that each element of a cause of action is present. *See Wolman v. Tose,* 467 F.2d 29, 33 (4th Cir.1972). Furthermore, in considering a Rule 12(b)(6) motion, the complaint is to be construed in the light most favorable to the plaintiff and the court is to assume its factual allegations to be true. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Martin Marietta v. Int'l Tel. Satellite,* 991 F.2d 94, 97 (4th Cir.1992). Finally, "A motion to dismiss for failure to state a claim should not be granted unless it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of the claim." *McNair v. Lend Lease Trucks, Inc.,* 95 F.3d 325, 328 (4th Cir.1996) (*en banc*).

Should the Court determine that Defendants' motion to dismiss is not well-taken. Defendants have also moved for summary judgment in the alternative. Pursuant to Rule 56(c), summary judgment is appropriate when the pleadings and discovery documents before the court reveal that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Miller v. Federal Deposit Ins. Corp.*, 906 F.2d 972, 974 (4th Cir.1990). A genuine issue exists if there is evidence on which a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The evidence of the non-movant is to be believed and all justifiable inferences drawn in her favor, *Matsushita Electric Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), but a party cannot create a genuine issue of material fact through mere speculation or a compilation of inferences. *See Runnebaum v. NationsBank of Md., N.A.*, 123 F.3d 156, 164 (4th Cir. 1997) (citing *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505). Likewise, the party opposing summary judgment cannot rest upon mere allegations, denials, or a "mere scintilla of evidence" in order to overcome summary judgment. *See Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. Instead, where the movant makes out a prima facie case that would entitle him to judgment as a matter of law at trial, summary judgment will be granted unless the opposing party offers some competent evidence that establishes the existence of a genuine issue of material fact for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■ The Court will first consider Defendants' 12(b)(1) motion because if the Court lacks jurisdiction to hear this case, or if the Commission lacks authority under the Act to bring this case before the Court, all other issues would be moot. In the memorandum in support of their motions. Defendants argue that the Commission lacks jurisdiction under the Act to bring this case before the Court, and therefore the Court lacks jurisdiction under the Act to hear the case, because Defendants' did not offer or sell futures or options contracts to their customers. Instead, Defendants contend that they engaged in "spot" or "cash forward" transactions that fall outside the purview of the Commission's statutory jurisdiction.

Defendants rely on several cases to support their arguments on this point, including the Fourth Circuit's decision in *Salomon Forex, Inc. v. Tauber*, 8 F.3d 966 (4th Cir.1993), *cert. denied*, 511 U.S. 1031, 114 S.Ct. 1540, 128 L.Ed.2d 192 (1994). In the *Salomon Forex* case, the precise issue before the Fourth Circuit was whether "professional traders may individually negotiate sales of foreign currency futures and options off organized exchanges without violating the Commodities Exchange Act." *Id.* at 969. Salomon Forex, a commodities firm, brought suit against a foreign currency trader to recover a trading debt of $26 million. The Fourth Circuit held that "individually-negotiated foreign currency option and futures transactions between sophisticated, large-scale foreign currency traders fall within the Treasury Amendment's exclusion from CEA coverage." *Id.* at 978. Although the case dealt with the interpretation of the Treasury Amendment and it's application to the Commodity Exchange Act, the case includes a substantial review of the general purposes of the Act and the definitions of a "futures contract," a "commodity," and a "cash forward" transaction. As to the Act's purpose, the Fourth Circuit found:

Today the CEA establishes a comprehensive system for regulating futures contracts and options. It provides at its core that no person shall enter into, or offer to enter into, a transaction involving the sale of a "commodity for future delivery," unless it is conducted on or through a board of trade designated and

regulated by the Commodity Futures Trading Commission ("CFTC") as an exchange ("contract market").

*Id.* at 970. The Fourth Circuit determined that because "the Act was aimed at manipulation, speculation, and other abuses that could arise from the trading in futures contracts and options . . ., Congress never purported to regulate 'spot' transactions (transactions for the immediate sale and delivery of a commodity) or 'cash forward' transactions (in which the commodity is presently sold but its delivery is, by agreement, delayed or deferred.)" *Id.* From its review of the history and purpose of the Act, the Fourth Circuit concluded, "[T]he CEA thus regulated transactions involving the purchase or sale of a commodity 'for future delivery' but excluded transactions involving 'any sale of any cash commodity for deferred shipment or delivery.'" *Id.* at 971.

Noting that the Act does not precisely define a "futures contract," the Fourth Circuit pieced together an accepted meaning for the term, concluding:

> [A "futures contract"] is generally understood to be an executory, mutually binding agreement providing for the future delivery of a commodity on a date certain where the grade, quantity, and price at the time of delivery are fixed. To facilitate the development of a liquid market in these transactions, these contracts are standardized and transferrable. Trading in futures seldom results in physical delivery of the subject commodity, since the obligations are often extinguished by offsetting transactions that produce a net profit or loss. The main purpose realized by entering into futures transactions is to transfer price risks from suppliers, processors and distributors (hedgers) to those more willing to take the risk (speculators). Since the prices of futures are contingent on the vagaries of both the production of the commodity and the economics of the marketplace, they are particularly susceptible to manipulation and excessive speculation.

*Id.* After establishing this definition as the appropriate one for purposes of the Act, the Fourth Circuit went on to consider the differences between a "futures contract" and a "spot" or "cash forward" transaction, stating:

> In contrast to the fungible quality of futures, cash forwards are generally individually negotiated sales of commodities between principals in which actual delivery of the commodity is anticipated, but is deferred for reasons of commercial convenience or necessity. These contracts are not readily transferable and therefore are usually entered into between parties able to make and receive physical deliver of the subject goods.

> \* \* \* \* \* \*

> The definition of "commodity" was substantially broadened to include, in addition to specified agricultural products, "all other goods and articles . . . and all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in," except for specific items not relevant to the present discussion. See 7 U.S.C. § 1a. Because the CEA·uses the term "commodity" in setting the jurisdiction of the CFTC, that agency's jurisdiction under the Act was greatly expanded by this redefinition. See 7 U.S.C. § 2.

*Id.* at 971–72.

Since the *Salomon Forex* case dealt with foreign currency, it's direct holding is not implicated in the present case because there is no allegation that Defendants offered, sold, or otherwise transacted in foreign currency. It is important to note, however, that the Fourth Circuit's holding is specifically limited to the facts of the case. In rejecting Tauber's attempt to avoid his obligations through the argument that the Act barred such transactions, the Court placed great weight on the fact that Tauber was a highly sophisticated investor.

*Id.* at 978. The court strongly suggested that if Tauber were not a sophisticated investor who engaged in hundreds of millions of dollars worth of investments and transactions, the outcome of the case would have been different. *Id.*

Defendants also rely heavily on decisions by the District Court for the Southern District of Florida and the Eleventh Circuit, In *CFTR v. Midland Rare Coin Exchange,* the district court denied injunctive relief against a defendant upon the finding that the sale of precious metals by defendant Global Asset Management was outside the scope of the Act. Case No. 97–7422–Civ–Highsmith (S.D.Fla. Dec. 9, 1997). In reaching this determination, the court relied heavily on the testimony of Mark Modist, president of Global, in finding that Global's transactions required immediate potential delivery and that Global had the ability to deliver all obligations upon full payment by its customers. *Id.* at 3. Upon this evidence, the court concluded that Global's sales of precious metals "were cash forward or spot transactions and not futures." *Id.* The Eleventh Circuit affirmed this finding in an unpublished decision, applying an abuse of discretion standard to the denial of the preliminary injunction and a clearly erroneous standard to the district court's reliance on the testimony of Modist. *CFTR v. Midland Rare Coin Exchange,* No. 97–5966, 1998 WL 333555 (11th Cir. June 16, 1998).

In order to assess the merit of Defendants' arguments on this point, it is necessary to establish whether Defendants in fact offered futures contracts or whether their business involved either cash forward or spot transactions. It is clear from the record that definitions of these transactions as set forth in *Salomon Forex* do not squarely fit the facts of this case. The contracts offered by Defendants did not explicitly provide for the future delivery of a commodity on a date certain where the grade, quantity, and price at the time of delivery are fixed, and thus do not fall perfectly within the definition of a "futures contract." On the other hand, it does not appear that the contracts anticipated future delivery, nor delayed it for reasons of commercial convenience or necessity. and thus cannot fully be considered to be "cash forward" transactions either.

The Ninth Circuit's decision in *CFTC v. Noble Metals International, Inc.* offers guidance on resolving whether the types of transactions engaged in by Defendants in this case were futures contracts or cash forward transactions. 67 F.3d 766 (9th Cir.1995). In *Noble Metals,* the Commission brought suit against corporate and individual defendants alleging that they had violated § 6a of the Act by offering and selling illegal off-exchange futures contracts to the public. *Id.* at 768. The defendants contended that the contracts were cash forward contracts and were exempt from the Commission's jurisdiction. *Id.* The facts of the case revealed that the defendants sold precious metals to members of the general public under a program they called the "Forward Delivery Program." *Id.* at 769. For a 15–percent administrative fee, the program afforded customers the right and the obligation to make or take delivery of specified quantities of precious metals at a price agreed upon on the date of contracting. *Id.* The account information sent to customers specifically advised them that they were required to take or make delivery of the merchandise, although delivery could be delayed up to three years. *Id.* The corporate defendants arranged for other companies to act as third-party agents and arrange to take receipt and make delivery, of the metals whereby the customer received legal title upon remission of the full purchase price. *Id.* Rather than take delivery, the customers would contract with the third-party agents to receive and then sell the metal. *Id.* The court found that as a practical matter no metal exchanged hands as the third party would sell the metal back to defendant Noble as part of a paper transaction. *Id.*

In considering the district court's entry of summary judgment against the defendants, the Ninth Circuit was forced to determine whether the "Forward Delivery Program," which the defendants argued was a cash forward program, fell within the scope of the Commission's jurisdiction under the Act. *Id.* at 772–73. The Ninth Circuit noted that the essence of a futures contract was that it "enables an investor to hedge the risk that the price of the commodity will change between the date the contract is entered and the date delivery is due—without having to take physical delivery of the commodity." *Id.* at 772 (citing *CFTC v. Co Petro Mktg. Group, Inc.,* 680 F.2d 573, 579–80 (9th Cir.1982)). By contrast, the court stated that the "narrow" exclusion within the Act for cash forward contracts was "predicated on both parties contemplating and intending future delivery of the actual commodity when immediate delivery would be commercially impracticable." *Id.* (citing *Co Petro,* 680 F.2d at 578). The court stated that this exclusion was " 'unavailable to contracts of sale for commodities which are sold merely for speculative purposes and which are not predicated upon the expectation that delivery of the actual commodity by the seller to the original contracting buyer will occur in the future.' " *Id.* (citing *Co Petro,* 680 F.2d at 579).

Applying these legal principles to the facts before it, the Ninth Circuit found that only a handful of the transactions entered into by Noble contemplated actual delivery to the original investor. *Id.* at 772–731. Upon a finding that there was no legitimate expectation that Noble's customers would take delivery of the metal they bought, the court affirmed the district court's entry of summary judgment in the Commission's favor on its claims under Title 7, United States Code, Section 6. *Id.* at 773.

Other cases have resulted in the same conclusion, with courts finding that in order for the cash forward exclusion to apply, there must be an actual expectation of delivery the seller and the buyers. As cited in the *Noble Metals* case, the Ninth Circuit found in *CFTC v. Co Petro Mkting. Group, Inc.* that the intention and capacity of a customer to take actual delivery of a commodity at the time of contracting is essential for the application of the cash forward exclusion. 680 F.2d 573, 578–79 (9th Cir.1982). In *Andersons, Inc. v. Horton Farms, Inc.,* the Sixth Circuit found that the key to determining whether the transaction was within the cash forward exclusion was "whether there is a legitimate expectation that physical delivery of the actual commodity by the seller to the original contracting buyer will occur in the future." 166 F.3d 308, 318 (6th Cir.1998) (relying heavily on *Salomon Forex* ). Ultimately, even the court in the *Midland Rare Coin* case determined on the Commission's motion for summary judgment that the contracts at issue in that case were futures contracts within the jurisdiction of the Commission. 71 F.Supp.2d 1257, 1262–63 (S.D.Fla.1999) (finding "most importantly in this Court's opinion, there was no legitimate expectation that physical delivery of the precious metals would occur, and the customers' intention, .... was to speculate and profit from anticipated price rises in precious metals"). Additionally, a defendant's self-serving labels are of no value in determining the true nature of the transactions and should not deter, as a matter of law, a finding that transactions are in fact futures contracts subject to the Act. *See id.* at 1262; *Noble Metals,* 67 F.3d at 773, *Andersons, Inc.,* 166 F.3d at 319–20.

In the present case, Defendants solicited customers over a period of approximately eight years from offices located in California, Nevada, Arizona, and finally in North Carolina, upon representations that despite silver's poor recent performance, it was expected to rise to price levels anywhere from $10 to $15 up to $40 to $50 in a short period of time. The substantial weight of the evidence demonstrates that customers entered into the transactions

with the intent to speculate on the forecasted rise in the price of silver, or other commodities offered by IMC/IBS including gold, platinum, palladium, heating oil, and crude oil. Despite Defendant Finateri's testimony that he did not know what a futures contract was and engaged in only physical sales of actual metal, the clear evidence before the Court contradicts this self-serving assertion. Defendants have produced evidence as to only a handful of deliveries of metal made to seven individuals between 1994 and 1996. In addition, Defendants have identified six other individuals who they claim took delivery, but for whom no documentation of shipment is available; however, the Commission's evidence establishes that at least one of these individuals, Jim Foster, was never even a customer of IMC/IBS. Defendants have produced no evidence that any customer ever took delivery of heating or crude oil. Even taken as a whole, Defendants' evidence is clearly inadequate to rebut the Commission's showing or establish that customers entered into transactions with IMC/IBS with the intent that actual physical delivery would occur in the future. On the contrary, the Commission's evidence establishes that even when customers were informed of their right to take delivery upon full payment. Defendants and their employees actively discouraged the taking of delivery. Further, Defendant Finateri testified that IMC/IBS had 300 to 400 customers. Taking this testimony to be true, Defendants' argument that they engaged in cash forward or spot transactions is undermined by their ability to identify only a handful of actual shipments, the most recent of which was four years ago. The case law discussed herein makes it clear that a showing of isolated deliveries is not sufficient for the cash forward exclusion to apply. *See Noble Metals*, 67 F.3d at 772–73.

The finding that the transactions offered by IMC/IBS were in fact futures contracts entered into for speculative purposes is bolstered by other evidence as well. Despite Defendant Finateri's and Relief Defendant Kingsfield's testimony that IBS–Bahamas was preparing or otherwise in possession of documentary proof that any Defendant and/or Relief Defendants actually held possession of the silver or other commodities, not a single warehouse receipt or other document has been offered into evidence to substantiate the claims that someone, somewhere actually held and stored the commodities on behalf of IMC/IBS's customers. Nonetheless, the evidence is clear that IMC/IBS charged customers high storage fees. In addition, the claims that Defendants and/or Relief Defendants entered into a series of hedging transactions to cover the possibility that customers would seek to take delivery simply is not borne out by the evidence before the Court. At most, Relief Defendant Kingsfield identified one small Canadian account through which some isolated hedging transactions may have been entered into on behalf of IMC/IBS. Again, however, no documents were offered to substantiate these self-serving statements. Therefore, Defendants' claims that IMC/IBS could deliver upon request all of the $23 million in commodities the companies purported to hold for their customers simply has no basis in the evidence now before the Court. On the basis of the evidence before it, the Court finds that the Commission has met it's initial burden to establish that it has jurisdiction over Defendants' conduct, that the allegations in the Complaint are properly before this Court, and that the transactions offered by IMC/IBS were futures contracts.

Under the applicable standards for considering a 12(b)(1) motion to dismiss as set forth by the Fourth Circuit, Defendants have not met their burden to establish that the material facts are not in dispute and that the Court lacks jurisdiction as a matter of law. While the issue of subject matter jurisdiction is one that may be raised at any time, the evidence now before the Court leads to a finding that Defendants' activities fall within the scope of the Act, and therefore, the Commission

has the statutory authority to bring this case before this Court and the Court has subject matter jurisdiction over the Commission's claims. Accordingly, the Court will deny Defendants Finateri and Stein's motion to dismiss for lack of subject matter jurisdiction.

As to Defendants' motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court finds that the Complaint filed by the Commission sets forth proper and legally sufficient claims under the Act. Count One contains specific allegations of fraud in connection with the sale of commodity futures contracts that closely track the language of 7 U.S.C. § 6b(a)(i)–(iii). (Compl. at ¶¶ 57–60). Likewise, Count Two contains specific allegations concerning Defendants' offer and sale of illegal commodity futures contracts in violation of 7 U.S.C. § 6(a). Finally, Count Three is not implicated by Defendants' motion because it seeks disgorgement of ill-gotten gains received by the Relief Defendants. Therefore, the Court finds that the Commission's Complaint is legally sufficient to withstand Defendants' motion to dismiss under Rule 12(b)(6).

Finally, the Court finds that Defendants' motion for summary judgment fails as well under the applicable legal standards stated herein. Defendants have not demonstrated that no genuine issue of material fact exists so as to entitle them to judgment as a matter of law. On the contrary, the evidence now before the Court supports the allegations made by the Commission in the Complaint. Therefore, the Court will deny Defendants' motion for summary judgment.

*B. The Commission's Motion for a Preliminary Injunction as to Defendants*

■ The general legal standard applicable to a motion for entry of a preliminary injunction is set forth in Rule 65 of the Federal Rules of Civil Procedure. As interpreted by the Fourth Circuit in *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Manufacturing Co., Inc.,* a four-

factor test is applied by a district court considering such a motion. 550 F.2d 189, 194–96 (4th Cir.1977). First, the court must balance the likelihood of irreparable harm to the plaintiff if the injunction is denied. Second, the court must balance this against the likelihood of harm to the defendant if the injunction is granted. Third, the court must consider the probability that plaintiff will succeed on the merits. Finally, the court will consider the public interest at stake. The first two considerations involving probable irreparable injury to the plaintiff without the decree and the likely harm to the defendant with the decree are the most important factors, and where this balance weights in favor of the plaintiff, a plaintiff need not always show a likelihood of success. *Id.* at 196.

■ Most courts considering the issue have found that the general standards applicable under Rule 65 do not apply where a motion for preliminary injunction is made pursuant to the statutory authority given to the Commission under 7 U.S.C. § 13a–1(a)–(b). *See, e.g., CFTC v. Hunt,* 591 F.2d 1211, 1220 (7th Cir.1979) (stating that once a violation is demonstrated, the movant need only show "some reasonable likelihood of future violations"); *CFTC v. Muller,* 570 F.2d 1296, 1300 (5th Cir.1978) (stating that a *prima facie* case of illegality is sufficient for the court to impose a statutory injunction). Such a conclusion is based on the nature of the public rights the Commission is given the statutory authority to enforce, as opposed to the usual private action involving rights rooted in the equity jurisdiction of the court.

While the Fourth Circuit has not yet considered whether it would adopt this rule in applying the Act, the Fourth Circuit has held in similar cases involving statutory preliminary injunctions that a showing of a reasonable likelihood of future violations of a federal statute is sufficient to warrant the entry of such an injunction. In *Kemp v. Peterson,* the Fourth Circuit found that the district court

did not abuse it's discretion in granting an injunction upon a showing by the Secretary of Housing and Urban Development that violations of the Interstate Land Sales Full Disclosure Act had occurred and that there was a "reasonable likelihood" of future violations. 940 F.2d 110, 112–13 (4th Cir.1991). The court cited *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808–09 (2nd Cir.1975) to support the finding that once a federal agency or commission shows the violation of a specific federal statute, the usual balancing of equities is not required to enjoin possible future violations. *Id.* at 113; *see also, NLRB v. Aerovox Corp.*, 389 F.2d 475, 477 (4th Cir. 1967). Therefore, the Court finds that the legal standard applicable to the Commission's motion requires that it demonstrate that a violation of the Act has occurred and that there is a reasonable likelihood of future violations unless Defendants' conduct is enjoined.

■ On the evidence now before it, the Court finds that the Commission has demonstrated that Defendants have violated the Act and that there is a reasonable likelihood of future violations unless the Court enjoins Defendants' unlawful conduct. As to Count One for violations of 7 U.S.C. § 6b(a)(i)–(iii), the Court finds that the Commission has demonstrated that beginning in 1992 or earlier, the corporate and individual Defendants have engaged in transactions and solicited customer's with the intent to defraud and mislead such persons with respect to the offer and sale of illegal futures contracts. As to Count Two for violations of 7 U.S.C. § 6(a), the evidence is clear that Defendants have offered to enter into and entered into transactions for contracts for the purchase or sale of commodities for future delivery where such transactions have not been conducted on or subject to the rules of a board of trade properly designated by the Commission as a "contract market" for such commodity and that such contracts have not been executed properly through a member of such contract market. The

evidence presented to the Court strongly supports the finding that the corporate Defendants constitute a common enterprise through which fraudulent futures contracts are sold and that such contracts were not subject to the rules of properly designated contract markets. With respect to the individual Defendants, the evidence is clear that each acted or purported to act on behalf of one or more of the corporate Defendants in furtherance of the illegal schemes, and that with respect to Finateri and Stein in particular, their actions as executives and directors of the corporate Defendants created personal liability under 7 U.S.C. § 13c(b) for knowingly and directly controlling acts of others constituting violations of the Act.

The factual findings of the Court contained herein establish a clear and long-standing scheme on the part of Defendants to cheat and defraud customers through the use of various corporate entities designed to put an apparently legitimate face on their conduct. Defendants have solicited members of the general public to purchase futures contracts for precious metals and other commodities upon highly deceptive and misleading representations as to huge potential profits while failing to disclose the significant costs of associated account, storage, and other up-front fees or otherwise disclose in an appropriate and timely manner the substantial risks involved in speculating on commodity prices. These commodity contracts have been offered illegally under the Act as the contracts are not made on or subject to rules of all established board of trade, exchange, or market. Such conduct has been willful on the part of each Defendant and undertaken with the intent to deceive and defraud members of the public. Despite Defendants' assertions to the contrary, no evidence is before the Court at this time to substantiate the claims that any Defendant or Relief Defendant actually holds or otherwise stores the commodities for their customers. Instead, the evidence weighs heavily towards a finding that Defendants falsified account records and charged exor-

bitant fees to customers for services the Defendants did not provide.

Finally, the Court rejects Defendants' argument that the Commission's evidence and reliance on affidavits from only seven customers is insufficient. This evidence, along with the supporting documents and other exhibits, clearly establishes that violations of the Act have occurred and reveals Defendants' long-standing scheme and pattern of conduct designed to defraud investors. The Commission need not establish that every transaction entered into by Defendants was fraudulent in order to prevail, and Defendants have offered no evidence to rebut the Commission's showing. Therefore, the Court finds that the Commission has met it's burden to establish that Defendants' have violated the Act.

▐ The Commission's evidence also establishes a probability that if Defendants are not enjoined, they will commit future violations of the Act. Defendants have demonstrated a willingness to relocate to another jurisdiction when faced with possible sanctions for their conduct. The evidence establishes that IMC–NV operated up until such time as the State of Nevada threatened to enter a cease and desist order for violations of Nevada securities laws. Shortly thereafter, IMC–AZ was incorporated, followed closely by IBS–NC and IMC–NC, and the fraudulent scheme continued from the new locations. Additionally, Defendant Stein was found to be in contempt of Court at one point in these proceedings for, among other violations of the Statutory Restraining Order, attempting to trade in foreign accounts frozen by this Court's Order. While Defendant Stein denied such an accusation. testifying that Mr. Kingsfield made the trades in question, Mr. Kingsfield testified at his preliminary injunction hearing that he had no control over the account in question and did not make the trades. In any event, the Court finds that there is sufficient evidence to conclude that a reasonable likelihood exists that Defendants' illegal conduct will continue unless enjoined.

▐ Although only the individual Defendants, Finateri, Stein, and Temple, have entered appearances before this Court, the record makes it clear that the corporate Defendants have been properly served in this matter and should likewise be bound by the Court's decisions. The Commission's evidence makes it clear that Finateri serves as president of the Joe Miller Company, is the sole officer of IMC–NV and IMC–CA, and serves as an officer of IMC–AZ. Also, the evidence reveals that Stein is an officer of IMC–AZ and purports to be Controller of IMC–CA and IMC–NV. Stein also purports to be the president of Pinpoint Marketing and a director of IMC–NC. Although the corporate filings in North Carolina on behalf of IBS–NC do not identify either Stein or Finateri as a director, the evidence before the Court supports a finding that either Stein or Finateri, or both, managed IBS–NC or otherwise acted as a director of the company. The record reveals that service as to these corporate Defendants was properly effected by the Commission through service of upon Finateri and/or Stein in their representative capacity as agents and directors for the respective corporations. (Doc. 17). Given that service was proper and that the corporate Defendants have notice of these proceedings, the failure of these entities to properly enter an appearance through counsel in this case or otherwise object to the sufficiency of service of process does not prevent the Court from exercising jurisdiction over the companies or entering a preliminary injunction against them.

C. *Relief Defendants' Motions to Vacate the Statutory Restraining Order and to Dismiss*

▐ At oral argument, counsel for Relief Defendants Kimberlynn Creek Ranch, Inc., Kingsfield Racing, Inc., and Samuel and Pamela Kingsfield objected to the Court's decision to allow into evidence the affidavits and supporting documents offered by the Commission in support of the

motion for preliminary injunction.[2] The Court overrules this objection upon a finding that affidavits are competent evidence and are admissible in a preliminary injunction proceeding. *See American Angus Assoc. v. Sysco Corp.*, 829 F.Supp. 807, 816 (W.D.N.C.1992). Affidavits are appropriate forms of evidence in such proceedings due to the less formal nature of a preliminary injunction hearing and the need to take action to avoid irreparable injury. *See id.* (citing *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, Civil 2d § 2949 at 471; *Federal Savings & Loan Insurance Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir.1987); *SEC v. Cherif*, 933 F.2d 403 (7th Cir.1991)).

■ In support of their Motion to Vacate *Ex Parte* Statutory Restraining Order, Relief Defendants argue that this Court wrongly entered the Order because the Commission lacks the authority to bring this action and the Court exceeded its statutory authority in issuing the Order on an *ex parte* basis. The Court has already considered and rejected herein the argument that the Commission lacks jurisdiction to bring this case and the Court lacks subject matter jurisdiction to hear the case because the contracts offered by Defendants were spot transactions. In Section III–A, the Court fully considered and flatly rejected the blind application of only one small portion of the *Midland Rare Coin Exchange* case to the present case. While the Court appreciates Mr. Bonner's attempts to enlighten the Court on the basis of his experience in defending Global Asset Management in that case, Mr. Bonner's narrow reliance on the unpublished order of the district court denying the entry of a preliminary injunction as

to Global is misguided. As discussed herein, the relevant legal authority and the facts of this case strongly support the finding that Defendants offered illegal futures contracts. Accordingly, it is clear that the Commission has met it's initial burden to establish jurisdiction and that neither Defendants nor Relief Defendants have met their legal burden to establish that the material facts are not in dispute and that the Court lacks jurisdiction as a matter of law.

In moving to dismiss this case and joining in Defendant's motion to dismiss, Relief Defendants largely rely on the argument that the Court lacks jurisdiction over Defendants and thus cannot entertain this case. Although it does not appear to the Court that Relief Defendants explicitly argue that regardless of whether the Court has subject matter jurisdiction as to Defendants, the Court lacks subject matter jurisdiction as to Relief Defendants, the Commission has responded to such an argument. To the extent that Relief Defendants may seek to differentiate between the basis of subject matter jurisdiction over Defendants, if proper, and the potential lack of a basis for subject matter jurisdiction as to Relief Defendants, the Court finds that it has subject matter jurisdiction over Relief Defendants. In Count 3 of the Complaint, the Commission asks that Relief Defendants be required to disgorge the funds and assets, or the value thereof, that are traceable to Defendants' fraud. Given that there is no claim of legal liability for the actual fraud committed against IMC/IBS investors, the Relief Defendants potential liability in this case is limited to the return of property diverted by Defendants to the Relief Defendants and to which Relief Defendants have no legitimate claim. In such a case, where there is no claim against a nominal or relief defen-

---

**2.** As used in considering the arguments in this section, the term "Relief Defendants" is intended to refer to those Relief Defendants who have entered an appearance in this case and made these motions to the Court, namely Pamela and Samuel Kingsfield, Kimberlynn

Creek Ranch, and Kingsfield Racing. Although the other named Relief Defendants have been served, they have not made an appearance in this case. The Court will consider the effect of this later in this memorandum.

dant, it is unnecessary to obtain subject matter jurisdiction over him once jurisdiction over the defendant is established. *See SEC v. Colello*, 139 F.3d 674, 676 (9th Cir.1998): *SEC v. Cherif*, 933 F.2d 403, 414 (7th Cir.1991). While Relief Defendants attempt to distinguish the broad authority of the SEC and argue that the Commission has much less authority under the Commodity Exchange Act, the Court reads these cases as relying upon general legal principles and a court's inherent ability to recover ill-gotten gains for the benefit of the victims of the defendant's wrongdoing rather than a peculiarity of the Securities Exchange Act. Even if this were not the case, there is no flat rule preventing courts from reasoning by analogy from cases involving the SEC. *See, e.g., CFTC v. Hunt*, 591 F.2d 1211, 1223 (7th Cir.1979) (showing a court's willingness to look to cases involving the SEC by analogy to determine the scope of the Commission's powers). Therefore, to the extent that Relief Defendants may seek to distinguish between the basis of subject matter jurisdiction over Defendants as compared to the basis for subject matter jurisdiction over them, the Court rejects such an argument. *

■ Relief Defendants also contend that the Court exceeded the scope of it's authority under 7 U.S.C. § 13a–1 by issuing the temporary restraining order on an *ex parte* basis. Relief Defendants state in their memorandum in support of the motion, "This Elian Gonzalez type raid by the CFTC is shocking and offensive." (Rel. Def.Mem. at 3). At oral argument, Relief Defendants contended that the statutory basis for an *ex parte* restraining order was very narrow and did not allow for the taking or freezing of assets held by third parties and suggested that the Court had been tricked by the Commission into blindly granting the request. Relief Defendants argued that the Act did not allow a court to authorize the sale of assets held by third parties for foreign customers. Additionally, Relief Defendants argued that the inclusion of "Relief Defendants" in

the law suit was improper because there was no allegation of wrong-doing on the part of the Relief Defendants. Instead, the Relief Defendants contended that the Commission is attempting to impermissibly broaden it's statutory authority by relying on case law relating to the Securities Exchange Commission. The Relief Defendants submit that such an attempt should be rejected by this Court because the enabling statute for the SEC is much broader than the CEA.

The Court finds that it acted within the statutory authority pursuant to § 13a–1(a)–(b) in issuing the *ex parte* restraining order in this case. First, the plain language of the Act states that an *ex parte* restraining order may be issued as to "any person" to prohibit such person(s) from "destroying, altering or disposing of, or refusing to permit authorized representatives from the Commission to inspect, when and as requested, any books and records or other documents *or which prohibits any person from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets, or other property* . . . ." 7 U.S.C. § 13a–1(a) (emphasis added). This language, broadly referring to "any person" and "any funds," allows the Court to freeze the assets held by Relief Defendants where the Commission has made a showing that such funds were channeled to the Relief Defendants from Defendants and represent funds wrongfully obtained by Defendants in violation of the Act. This authority, while not unfettered, is very broad and the language of the Statutory Restraining Order of March 13, 2000 fits within this *ex parte* exception as stated in the Act. *See CFTC v. Hunt*, 591 F.2d 1211 (7th Cir.1979) (stating that district court has wide authority to issue appropriate relief under the Act). Second, the case law supports the plain meaning of the Act in allowing a court to freeze assets of persons who were recipients of fraudulently obtained proceeds, but who did not engage in actual fraud themselves. In *CFTC v. American Board of Trade, Inc.*, the Second Circuit

recognized that the entry of a permanent injunction against certain defendants was proper even though the defendants had not been charged with fraud under the Act. 803 F.2d 1242 (2nd Cir.1986). In *SEC v. Colello,* the Ninth Circuit found that the broad equitable powers available to the district courts allowed for the recovery of ill-gotten gains held by third-party or nominal defendants that resulted from all underlying fraud. 139 F.3d 674, 676–77 (9th Cir.1998). While these cases are not directly on point to the issue before the Court, the decisions provide support for the Court's ability to reach proceeds obtained by fraud and held by the Relief Defendants. Third, Relief Defendants have not come forward with any evidence, other than the unsupported testimony of Pamela and Samuel Kingsfield, to rebut the Commission's showing that they in fact hold money belonging to IMC/IBS investors that was wrongly diverted to them by Defendants. Mr. Kingsfield acknowledged during his testimony that he received money from Defendants on numerous occasions and that such money was deposited in accounts held by himself, his wife, Kingsfield Racing, and Kimberlynn Creek Ranch. Mr. Kingsfield's only explanation for such payments was that every payment represented his "pay" for his services. (S. Kingsfield Test., 5/12/00 at ____). No records or tax forms were produced, however, to support Mr. Kingsfield's assertions. Further, there is evidence in this case to suggest that Mr. Kingsfield, who admitted being a director of IBS–Bahamas and who the Commission's evidence shows worked for IMC–NV at one time, would be liable for fraud and could be identified as a Defendant in this case. Finally, although the precise term "Relief Defendants" does not appear in the case law, the Court finds that it is an appropriate term to denote that such parties in this case, while not directly liable for underlying fraud, are nominal defendants who are liable for substantial ill-gotten gains arising from Defendants' fraud.

 Relief Defendants also seek to have this action dismissed for lack of personal jurisdiction. During their testimony, the Kingsfields stated that they were residents of Weldon, California. (P. Kingsfield Test., 5/12/00 at ____; S. Kingsfield Test., 5/12/00 at ____). As to the corporate Relief Defendants, it is argued that Kimberlynn Creek Ranch and Kingsfield Racing are California and Nevada corporations with no business relationship to North Carolina. These arguments, made without a single citation to any legal authority, ignore the fact that where Congress authorizes nationwide service of process under Rule 4(k)(1)(D), personal jurisdiction is automatic by operation of the Rule, Fed.R.Civ.P. 4(k). The only relevant inquiry that could make such an exercise of personal jurisdiction unconstitutional is whether the defendant has sufficient contacts with the entire nation under the Fifth Amendment to support an exercise of personal jurisdiction, not whether the defendant has sufficient minimum contacts with the forum state to support personal jurisdiction under the Fourteenth Amendment. *See ESAB Group, Inc. v. Centricut, Inc.,* 126 F.3d 617, 626–27 (4th Cir.1997); 4 Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure,* Civil 2d § 1067.1 (1987). Section 13a–1(e) specifically provides for service of process in "any district in which the defendant is an inhabitant or wherever the defendant may be found." 7 U.S.C. § 13a–1(e). This provision provides a clear basis to establish personal jurisdiction over Relief Defendants pursuant to Rule 4(k)(1)(D). Relief Defendants have not advanced an argument that such jurisdiction would be unconstitutional or otherwise violate the Fifth Amendment in this case, nor could such an argument succeed. The Kingsfields may currently be residents of California, but the Commission has offered evidence that they owned or rented property in the Western District during the relevant time period and that Mr. Kingsfield had an office in Charlotte. As to Kimberlynn Creek Ranch and

Kingsfield Racing, both are domestic corporations and no showing of hardship or heavy burden in defending this suit in this Court has been offered to this point. Based on the significant contacts of each Relief Defendant with the nation as a whole, the Court finds that an exercise of personal jurisdiction is appropriate under the Fifth Amendment.[3]

### D. The Commission's Motion for a Preliminary Injunction as to Relief Defendants

As discussed previously, the Commission does not allege that the Relief Defendants[4] are liable for an actual violation of the Act or for perpetuating a fraud directly on IMC/IBS investors. Instead, Relief Defendants stand in the position of nominal defendants whose liability is limited to the disgorgement of assets and funds they received as a result of Defendants' fraud and violations of the Act. Count 3 alleges that the Relief Defendants hold funds and assets in constructive trust for the customers of IMC/IBS and seeks the disgorgement of all such assets and funds that are traceable to the illegal activities of Defendants.

The plain language of § 13a–1(a)–(b) allows for the entry of a restraining order or injunction as to "any person" to prevent the disposal of assets or funds obtained in violation of the Act. The evidence offered by the Commission establishes that Relief Defendants each received funds diverted to them by Defendants. The evidence presented to the Court conclusively establishes that IBS–Bahamas received millions of dollars in customer funds diverted to it by Defendants illegal sale of futures contracts. Likewise, the evidence presented by the Commission establishes that the Kingsfields, Kimberlynn Creek Ranch, and Kingsfield Racing each received substantial amounts of customer funds diverted to them by Defendants either directly or through IBS–Bahamas. Samuel Kingsfield testified that payments made to him by Defendants and/or IBS–Bahamas and deposited in various accounts held by Mr. and/or Mrs. Kingsfield, Kimberlynn Creek Ranch, and Kingsfield Racing represented his "pay" for unidentified services he rendered. Mr. Kingsfield, however, did not come forward with any documentary evidence, tax forms, or pay stubs to substantiate his assertions and the Court does not believe that his testimony, elicited by a string of leading questions from Mr. Bonner, is credible. While it may be true that Mrs. Kingsfield was not aware of the source of funds diverted into her personal account, the Kimberlynn Creek account, and the Kingsfield Racing account, the evidence shows that hundreds of thousands of dollars of customer funds were nonetheless diverted to these account by Defendants, IBS–Bahamas, and/or her husband. Accordingly, these accounts are liable for any ill-gotten gains regardless of any active involvement by Mrs. Kingsfield. Finally, the Commission's evidence also establishes that Relief Defendants F.X. & B. and A.J.S. Enterprises also received cus-

---

**3.** Alternatively, the Court finds that the Relief Defendants represented by Mr. Bonner waived their right to contest personal jurisdiction over them through his participation on their behalf at the hearings on April 26–27, 2000 and the filing of a waiver of service of process on May 3, 2000. Although Mr. Bonner purported to enter a "special appearance" at that time, he argued extensively in support of Defendants' motion to dismiss for lack of subject matter jurisdiction, and even cross-examined witnesses during a contempt hearing that related solely to Defendants Stein, Finateri, and Temple. The Court finds that through these actions undertaken by their attorney, Mr. Bonner's clients waived

their right to contest personal jurisdiction. See Fed.R.Civ.P. 4(e)(1); N.C.GenStat. § 1–75.7; Trans World Airlines, Inc. v. Mattox, 897 F.2d 773, 787 (5th Cir.1990); Lynch v. Lynch, 302 N.C. 189, 274 S.E.2d 212, 218–19 (1981); In re Blalock, 233 N.C. 493, 64 S.E.2d 848, 855–56 (1951).

**4.** The term "Relief Defendants" as used in this section is intended to include all persons and entities identified in the Complaint as Relief Defendants, regardless of whether such person(s) or entities have entered an appearance before this Court.

tomer funds diverted to them by Defendants and/or IBS–Bahamas.

Under the case law discussed herein, a district court has the inherent power to enter an injunction against nominal defendants where those persons lack a legitimate claim to funds that they obtained through illegal activity of a defendant. The Court also has the authority to issue ancillary relief necessary to give effect to the purposes of the Commodity Exchange Act. *See CFTC v. Hunt,* 591 F.2d at 1221–22. The Court's findings herein clearly establish that an injunction under such a standard is appropriate in this case. The only way to fully remedy Defendants' fraud and protect the interests of defrauded investors is to allow the Commission to recover all funds traceable to such fraud, regardless of who now holds those funds and assets. Alternatively, under the traditional standard of Rule 65 requiring a showing or irreparable injury and a balancing between the risk of loss to the plaintiff and the burden to the defendant, the Court believes that an injunction would be proper in this case. Although the Kingsfields testified that the operations of both Kimberlynn Creek Ranch an Kingsfield Racing would be burdened by an asset freeze, no independent evidence has been offered to substantiate these claims. Further, to the extent that Relief Defendants each hold funds belonging to IMC/IBS customers and obtained by Defendants through illegal activity, any further dissipation of those funds would cause irreparable injury to the innocent customers and the Commission's attempts to recover those funds. Therefore, the Court finds that the Commission's motion for a preliminary injunction as to Relief Defendants should be granted.

Finally, the Court finds that the Relief Defendants who have been served but not entered an appearance before the Court should likewise be bound the injunction. Evidence has been offered that both Alan Stein and Samuel Kingsfield serve in an official capacity with IBS–Bahamas as directors of the corporation. Plaintiff's Exhibit 1 offered by the Commission at the contempt hearing against Alan Stein is a "Permit to Engage in Gainful Employment" in the Bahamas identifying Stein as the "Managing Director—International Bullion." The Return of Service as to IBS–Bahamas was filed on March 30, 2000 and indicates that personal service was effected upon IBS–Bahamas director Alan Stein at the Federal Courthouse in Charlotte, North Carolina. (Doc. 14). Likewise, the Commission's evidence and the Return of Service filed March 28, 2000 establishes that Stein was properly served in his official capacity with A.J.S. Enterprises. Finally, the Commission's evidence and the Return of Service filed March 28, 2000 establishes that Defendant Temple was properly served in his official capacity as a director of F.X. & B., L.L.C. Therefore, the Court finds that all Relief Defendants have proper notice of this suit and that the failure to enter an appearance before the Court in this matter does not prevent the entry of a preliminary injunction against them.

## IV. ORDER

**IT IS, THEREFORE, ORDERED** that the Commission's Motion for a Preliminary Injunction as to Defendants and Relief Defendants (doc. 4) is **GRANTED** and that such preliminary injunction shall be issued herewith; and

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss or in the Alternative Motion for Summary Judgment (doc. 36) is **DENIED;** and

**IT IS FURTHER ORDERED** that Relief Defendants Kimberlynn Creek Ranch, Inc., Kingsfield Racing, Inc., Samuel Kingsfield and Pamela Kingsfield's Motion to Vacate Ex–Parte Statutory Restraining Order and the incorporated motions of said Relief Defendants to dismiss for lack of subject matter jurisdiction and motion to

dismiss for lack of personal jurisdiction (docs. 57 & 75) are **DENIED.**