**BLUE CROSS AND BLUE SHIELD OF NEW JERSEY, INC., et al., Plaintiffs,**

v.

**PHILIP MORRIS, INCORPORATED, et al., Defendants.**

**No. 98 CV 3287(JBW).**

United States District Court, E.D. New York.

April 30, 2001.

Dewey Ballantine LLP, New York City by Paul J. Bschorr, Vincent R. FitzPatrick, Jr., Michael Hefter, Heather K. McDevitt, Dewey Ballantine LLP, Washington, DC by Martha J. Talley, for Plaintiffs Blue Cross, et al.

Arnold & Porter, Washington, DC by Murray R. Garnick, Sedgwick, Detert, Moran & Arnold, San Francisco, CA by Kevin J. Dunne, Sedgwick, Detert, Moran & Arnold, New York City by James T. Conlon, for Defendant Philip Morris, Incorporated.

Sedgwick, Detert, Moran & Arnold, New York City by David M. Covey, Kirk-land & Ellis, Washington, DC by Kenneth N. Bass, for Defendant Brown & Williamson Tobacco Corporation.

Greenberg Traurig, LLP, New York City by Alan Mansfield, Shook, Hardy & Bacon, LLP, Kansas City, MO by Gary R. Long, for Defendants Lorillard Tobacco Company, Lorillard, Inc.

Debevoise & Plimpton, New York City by Steven Klugman, for Defendant Council for Tobacco Research, U.S.A., Inc.

Jacob, Medinger & Finnegan, LLP, New York City by Barry S. Schaevitz, for Defendant Smokeless Tobacco Council, Inc.

Womble, Carlyle, Sandridge, & Rice, PLLC, Atlanta, GA by R. Dal Burton, Womble, Carlyle, Sandridge, & Rice, PLLC, Winston–Salem, NC by Thomas D. Schroeder, Ursula M. Henninger, Collier, Shannon, Rill, & Scott, PLLC., Washington D.C. by John B. Williams, for Defendants R.J. Reynolds Tobacco Co., and RJR Nabisco, Inc.

Chadbourne & Parke LLP, New York City by Thomas J. McCormack, for Defendant British American Tobacco (Investments) Limited (formerly known as British–American Tobacco Company Limited).

Simpson Thacher & Bartlett, New York City by Joseph McLaughlin, for Defendant BAT Industries P.L.C.

Davis & Gilbert, LLP, New York City by Bruce M. Ginsberg, for Defendant Hill & Knowlton, Inc.

Kasowitz, Benson, Torres & Friedman LLP, New York City by Leonard Feiwus, for Defendants Liggest Group Inc., Liggest & Myers, Inc., and Brooke Group Ltd.

Seward & Kissel, New York City by Anthony R. Mansfield, for Defendant The Tobacco Institute, Inc.

**REVISED MEMORANDUM & ORDER**

WEINSTEIN, Senior District Judge.

## I. Introduction

Plaintiff, Empire Blue Cross & Blue Shield of New York ("Empire"), is suing major tobacco product manufacturers and related entities ("Tobacco") for increased health care costs arising from deceptions about the effects of tobacco use on subscribers' health. Defendants proffer evidence that Empire shifted heightened medical outlays onto its subscribers in the form of premium increases and, consequently, that it has not suffered damage. Claiming that such a "pass on" defense is inapplicable to a RICO fraud action, plaintiff moves to exclude this evidence. For the reasons developed in part III, *infra* there is no pass on defense. Nevertheless, evidence of the basic facts of the insurance industry—including pass on premium practice to cover increased costs—will be admitted. This apparent anomaly under relevancy rules 401 and 402 of the Federal Rules of Evidence will be discussed in part IV, *infra*. The practical realities of juror decision making must be considered. It is better to shed light on the workings of the insurance industry with appropriate legal instructions then risk sub rosa speculations by an inadequately informed jury.

## II Facts

The factual allegations—fraud of defendants in denying smoking caused disease, leading to increased costs to the plaintiff—as well as Empire's theories of recovery have been set out at length. *See Blue Cross v. Philip Morris,* 113 F.Supp.2d 345 (E.D.N.Y.2000); *see also Simon v. Philip Morris,* 124 F.Supp.2d 46 (E.D.N.Y.2000) (collecting references to related opinions).

Plaintiff moves *in limine* to bar evidence which shows that it has passed increased health care costs onto its insured in the form of higher premiums. Examples include the proposed testimony for the defendants of Dr. Robert Hoyt and Dr. Harvey M. Sapolsky, experts on health insurance practice. Dr. Hoyt's testimony would counter arguments that "smoking related" costs are suffered by Empire. His conclusions appear in expert reports produced pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure:

1) "Insurance companies, [Empire] included, are financial intermediaries that set their rates so as to cover all anticipated claim costs. They function as a conduit though which health care costs for the aggregate pool of insureds are transferred." *Report* at 4 (Feb. 15, 2000).

2) "Demand for both medical care and health insurance is relatively inelastic. Hence, increases in costs can be shifted to insurance consumers without significantly reducing demand. As a result, as costs increase, from whatever source, insurers can pass the majority of these costs onto the insurance buyers through subsequent premium increases." *Id.* at 6.

3) There are no economic or regulatory impediments to [Empire's] ability to pass on the costs of smoking. *Report* at 4 (Mar. 6, 2000).

Dr. Sapolsky would offer similar testimony. *Report* at 15 (Feb. 17, 2000) ("Insurance companies, [Empire] included, are largely passthroughs for hospital and physician charges. The risks, with a brief lag, are borne by the buyers. This years experience is reflected in next year's premium."). The notion that insurance companies pass on their costs to consumers would also be supported by defendants' general testimony about the health insurance business, how it sets rates, and how it is financed.

III. *The "Pass On" Defense Under RICO*

■ Empire agrees that most of its costs are eventually passed on to subscribers through premiums. Nevertheless, it argues that under the dictates of *Hanover Shoe v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), that is not a defense to a RICO violation.

A. *Law*

■ "The 'collateral benefit' rule of tort law rests on the belief that the wrongdoer should be made to pay—the better to deter like conduct—whether or not the victim has providently supplied another source of compensation." *Carter v. Berger*, 777 F.2d 1173, 1175 (7th Cir.1985). Since *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), federal antitrust law has rested on a similar enforcement principle. *See Square D Co. v. Niagara Frontier Tariff Bureau Inc.*, 760 F.2d 1347, 1352 (2d Cir.1985) ("The Supreme Court has also rejected the argument that a plaintiff cannot recover damages it was able to pass on to its customers in the antitrust context") (Friendly, J.).

In *Hanover Shoe* the Supreme Court disallowed a defense by antitrust defendants who claimed that plaintiff was not entitled to damages for costs passed on to its customers. *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). The case involved an antitrust treble-damages action brought against a producer of shoe machinery by one of its customers, a manufacturer of shoes. *Id.* at 483, 88 S.Ct. 2224. The defendants argued that because Hanover Shoe had been able to recoup its losses by charging its customers more for its shoes it did not suffer any cognizable injury: it had passed on any illegal overcharge. *Id.* at 492, 88 S.Ct.

2224. The Court rejected the defense, holding that, except in limited circumstances, defendants may not introduce evidence that another party absorbed the plaintiff's increased costs resulting from antitrust violations. *Id.* at 494, 88 S.Ct. 2224.

The Court provided two reasons for the rejecting a pass on defense. First, it was unwilling to "complicate treble-damages actions" with attempts to trace the effects of an illegal overcharge on the shoe manufacturer's "prices, sales, costs and profits, and of showing that these variables would have behaved differently without" the violation. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 725, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) (discussing reasoning of *Hanover Shoe*). Second, the Court was concerned that allowing a pass on defense would diminish the advantages of private antitrust enforcement, increasing the likelihood that violators of antitrust laws would escape liability. It declared:

> In addition, if buyers are subjected to the passing-on defense, those who buy from them would also have to meet the challenge that they passed on the higher price to their customers. These ultimate consumers, in today's case the buyers of single pairs of shoes, would have only a tiny stake in a lawsuit and little interest in attempting a class action. In consequence, those who violate the antitrust laws by price fixing or monopolizing would retain the fruits of their illegality because no one was available who would bring suit against them. Treble-damage actions, the importance of which the Court has many times emphasized, would be substantially reduced in effectiveness.

*Hanover Shoe*, 392 U.S. at 493, 88 S.Ct. 2224.

In *Illinois Brick* the Supreme Court addressed a corollary problem, the "offen-

sive use" of the pass on theory by the indirect purchasers to recover damages for injuries passed on to them by intermediaries in the distribution chain. *See Illinois Brick Co. v. Illinois,* 431 U.S. at 724, 97 S.Ct. 2061. The State of Illinois and seven-hundred local governmental entities sued a group of concrete block manufacturers, charging that they conspired to fix prices. *Id.* at 726–27, 97 S.Ct. 2061. Plaintiffs had hired general contractors for several large construction projects in the Chicago area. *Id.* at 726, 97 S.Ct. 2061. In turn, the general contractors had subcontracted the masonry work to purchasers from the conspirators. *Id.*

Although plaintiffs were two distribution links on the distribution chain away from the manufacturers, they claimed that an overcharge of some three million dollars had been passed on to them by the subcontractors through the general contractors. *Id.* at 727, 97 S.Ct. 2061.

The Court dismissed the claim holding that indirect purchasers may not sue for antitrust damages. *Id.* at 736, 97 S.Ct. 2061. It explained that the outcome was dictated by *Hanover Shoe.* Principles of "judicial consistency" compelled the Court, it held, to prohibit the offensive use of a pass on theory where it had disallowed the defensive use of the doctrine in a similar factual situation. *Id.* at 730, 97 S.Ct. 2061. Moreover, it feared that permitting the former while disallowing the latter would create a risk of multiple liability. *Id.* at 738 n. 18, 97 S.Ct. 2061.

Dissenting in *Illinois Brick,* Justice Brennan argued that the risk of multiple liability could be avoided by bringing all potentially injured parties into the same court. *See id.* at 762–63, 97 S.Ct. 2061 (describing procedures for intra-district transfer under 28 U.S.C. § 1404(a) & (b) and 28 U.S.C. § 1407 and procedures for statutory interpleader under 28 U.S.C. § 1335). The majority rejected the Brennan proposal that would have allowed indirect purchasers to recover the fraction of the overcharge "passed on" to them, explaining:

> Permitting the use of pass-on theories ... essentially would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that would have absorbed part of the overcharge—from direct purchasers to middlemen to ultimate consumers. However appealing this attempt to allocate the overcharge might seem in theory, it would add whole new dimensions of complexity to treble-damages suits and seriously undermine their effectiveness.

Id. at 737, 97 S.Ct. 2061.

■ The Supreme Court has repeatedly emphasized that *Hanover Shoe's* prohibition of the pass on defense is a rule of general applicability. *See generally Kansas v. UtiliCorp United Inc.,* 497 U.S. 199, 216, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990) ("The possibility of allowing an exception, even in rather meritorious circumstances, would undermine the rule"; refusing to carve out an exception when 100% of the overcharge had been passed on to the indirect purchaser); *Illinois Brick,* 431 U.S. at 745, 97 S.Ct. 2061 (*"Hanover Shoe* itself expressly recognized the creation of exceptions to its rule barring pass-on defenses, and we adhere to the narrow scope of exemption indicated by our decision there."). Only two limited exceptions have been recognized: 1) the existence of a "cost-plus" contract, where the customer is locked-in to buying a fixed quantity of goods in advance regardless of price or 2) when the direct purchaser is owned or controlled by its customer. *Illinois Brick,* 431 U.S. at 730, 97 S.Ct. 2061.

These antitrust principles extend to federal RICO claims. *See generally Carter v. Berger,* 777 F.2d 1173, 1175 (7th Cir.1985). The damages provision in a RICO action is virtually the same as that under the antitrust laws. *Compare* 18 U.S.C. § 1964(c) (RICO) *with* 15 U.S.C. § 15 (1994) (antitrust). The same concerns which moved the Court to bar the pass on defense in antitrust actions—reducing the complexity in apportioning damages and encouraging deterrence by creating private attorneys general—apply with equal force in the RICO setting. *Carter,* 777 F.2d at 1175–76 (describing advantages of applying the *Hanover Shoe—Illinois Brick* rule in RICO claims); *see also Rand v. Anaconda–Ericsson, Inc.,* 794 F.2d 843, 849 (2d Cir.1986) (approving *Carter v. Berger* ).

### B. *Application*

Defendants object to the rejection of a pass on defense for two reasons. First, they contend that because plaintiffs subrogation claim is akin to a pass on theory, the "judicially consistent" course, expressed in *Illinois Brick,* permits the defense. Second, defendants argue that none of the policy factors underlying the pass on ban are present here, and thus this case is an exception to the *Hanover Shoe* rule. These arguments are not persuasive.

Defendants' first argument over-reads *Illinois Brick.* Defendants suggest that because plaintiff asserts both subrogated and direct claims, the doctrine of *Hanover Shoe—Illinois Brick* allows defendants to introduce evidence of pass on to defend against Empire's direct claims. Defendants note that the *Illinois Brick* Court held that "whatever rule is to be adopted regarding pass-on ... it must apply with equally to plaintiffs and defendants." *Illinois Brick,* 431 U.S. at 728, 97 S.Ct. 2061.

Defendants contend that because a subrogation action is akin to the offensive use of pass on, the judicially consistent policy that moved the Supreme Court in *Illinois Brick* requires allowance of its defensive use in the instant RICO cause of action.

*Illinois Brick* cannot be broadly read to suggest that a pass on defense is available when a single plaintiff prays for relief on alternative legal theories. The rule of *Illinois Brick* is more pointed: pass on damages will only rarely be permitted offensively or defensively. *See, e.g., Kansas v. UtiliCorp United Inc.,* 497 U.S. 199, 216, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990) (refusing to create an exception for utility companies which pass full costs onto consumers).

Empire's subrogation claim is not an offensive pass on suit under the RICO statute. In addition to its direct RICO claim, plaintiffs assert the rights of subscriber-subrogors on the theory that they incurred medical expenses which in fact the plaintiff paid (usually directly to the providers of the services). Plaintiff's subrogation claim is similar to that of an insurer which sues to recover medical expenses of a subscriber injured by a negligent automobile driver. Such a subrogated action is not predicated on the idea that costs may have been passed on to its insured in higher premiums. It is an independent action in which equitable principles are applied to shift a loss, for which the insurer has already paid compensation, to the one who caused the loss and whose equitable position is inferior to that of the insurer. *See Teichman v. Community Hospital of Western Suffolk,* 87 N.Y.2d 514, 521, 640 N.Y.S.2d 472, 663 N.E.2d 628 (1996); *Gibbs v. Hawaiian Eugenia Corp.,* 966 F.2d 101, 106 (2d Cir.1992). By undertaking to indemnify the claimant, the insurer (subrogee) is equitably subrogated to the claimant (subrogor) and succeeds to

the subrogor's rights against the obligor. *See, e.g., Teichman v. Community Hospital of Western Suffolk,* 87 N.Y.2d at 521, 640 N.Y.S.2d 472, 663 N.E.2d 628. The doctrine includes instances in which one person, not acting as a mere volunteer or intruder, pays a debt for which another person is primarily liable and which in equity and good conscience should be paid by the latter. A subrogation claim would still attach even if plaintiff provided insurance without charging premiums.

This is not to say that there is no merit to defendants' argument. While an individual subscriber suing in his own right the party which injured him would not be entitled to medical expenses as damages, under New York Insurance law, he would be permitted to recover premiums laid out for the prior two years and for sometime into the future. *See* N.Y. C.P.L.R. § 4545(c)(McKinney 2000); *see also New York Pattern Jury Instruction* 3:301 Comment (2000). To the extent that those recoverable premiums may include costs that were passed on, there may be some overlap in damages. Nevertheless, the subrogation action is not a simple proxy for pass on damages. Higher premiums because of smoking related injuries have been born by all subscribers, not simply smoker-subrogors. Plaintiff's subrogation claim is, moreover, but one of two alternative legal theories advanced by plaintiff to recover medical costs it has already assumed due to Tobacco's alleged fraud.

It is highly unlikely that these medical costs or increased premiums could be recovered in a direct action against Tobacco by millions of Empire's subscribers. The somewhat remote and attenuated risk of a partial double recovery against defendants is worth taking in order to strengthen the force of RICO as a matter of public policy.

Defendants' second argument, that this case is an exception to the general rule in *Hanover Shoe* is equally unavailing. The Supreme Court has been reluctant to permit exceptions to the *Hanover Shoe* rule. *See generally Kansas v. UtiliCorp United Inc.,* 497 U.S. 199, 216, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990); *Illinois Brick,* 431 U.S. at 745, 97 S.Ct. 2061. No exception is available here.

■ Defendants suggest that the deterrence concerns of *Hanover Shoe* are served by the fraud subrogation action, and there is thus no need to create a greater incentive to sue by barring the pass on defense against plaintiff's direct claims. The availability of a subrogated fraud action does not serve as an effective alternative to the private enforcement of the federal RICO statute which trebles damage awards. In most states, subrogated fraud claims redress different interests and offer less in damages. *Cf. Blue Cross & Blue Shield of N.J. v. Philip Morris,* 113 F.Supp.2d at 381 (separate accrual rule of statute of limitations applied when each subscriber discovered injury, not on later date when insurer paid claims). Concerns about double recovery can be resolved if and when they arise.

Defendants also argue that unlike *Hanover Shoe,* there is no difficulty in determining how much is passed on to the downstream customer. This subrogation claim is not sufficiently analogous to a pass on claim to allow easy apportionment. There are no differential premiums for smokers and non-smokers in New York. Increased premiums were born by all subscribers and are projected into the future. The complexities that the *Hanover Shoe—Illinois Brick* rule meant to contain are avoided by denying these defendants a pass on defense.

As already noted, under the collateral source rule of New York, when the cost of medical services are paid by a source like

health insurance, the court "must reduce the award by the amount [paid] ... less an amount equal to the premiums paid by plaintiff for such benefits." N.Y. C.P.L.R. § 4545(c) (McKinney 2000). Permitting a single party to recover expenditures that are foreclosed to individual plaintiffs under alternative theories serves the principles that underlie equitable subrogation and RICO and minimize any chance of present or future duplicative recovery.

In the event of a judgment favoring Empire, it would be appropriate for the recovery to be shared in the form of reduced future premiums or increased health services on behalf of all insureds. This is the plan of Empire as revealed at argument. The fact that a turnover in subscribers will provide benefits to those who did not pay the higher premiums is one of life's minor unfairnesses that the law cannot completely cure. *See, e.g., County of Suffolk v. LILCO,* 14 F.Supp.2d 260 (E.D.N.Y.1998) (rebates available to those who did not pay higher past electric rates).

## IV. *Admissibility Of Evidence*

### A. *Law*

 Under a classic approach to Rules 401 and 402 of the Federal Rules of Evidence governing relevancy, information about pass on insurance premium practice would be excluded. Only evidence which tends to prove or disprove a "material proposition of fact" is admitted as evidence-in-chief (or as bearing on the credibility of a witness or probative force of other relevant evidence). A "material proposition of fact," also referred to among other terms as an "ultimate material fact," a "proposition of ultimate fact," an "operative fact," a "factual element of the cause of action or defense in the case," and in Rule 401 of the Federal Rules of Evidence, as "any fact that is of consequence to the determination of the action," are factual examples of the general elements of the rule of law applicable to the case. Such material propositions of fact are required to be proved true to some level of probability in order to warrant a judicial remedy— or in the case of a defense, to avoid a remedy. For example, the legal element of "fraud" in the instant case is sought to be established in part by the factual proposition that defendants made misleading statements to potential smokers that "cigarettes are not known to cause disease."

 If a proposition of fact is not required to be proved under the applicable rule of substantive law, and thus is not material, any evidence introduced solely to prove or disprove it, directly or indirectly, is irrelevant and inadmissable; an evidentiary proposition is considered "relevant" only if it is logically related, either directly or through an inferential chain of proof, to at least one of the formal elements of the charges made or defenses raised in the case—e.g., a material proposition of fact. *See, e.g.,* Fed.R.Evid. 401, 402 (2001); *U.S. v. Malpeso,* 115 F.3d 155, 163–4 (2d Cir. 1997); Margaret A. Berger, et al., *Evidence* ¶ 401[403] (2000); 1 Kenneth S. Broun et al., *McCormick on Evidence* 637 (John W. Strong, 5th ed.1999); John H. Mansfield, Norman Abrahams, and Margaret Berger, et. al., *Cases and Materials on Evidence* 10–13 (9th Ed.1997); Clifford S. Fishman, *Jones On Evidence; Civil and Criminal* § 1:4 (7th ed.1992) (stating that "ultimately the evidence must be assessed against the elements of the cause of action, crime, or defenses at issue in the trial"); 1 John H. Wigmore, *Evidence in Trials at Common Law* § 29, at 969 (Peter Tillers ed., 1983); Edmund M. Morgan, et. al., *Basic Problems of State and Federal Evidence* 167–171 (5th Ed.1976); Jerome Michael & Mortimer Adler, *The Trial of an Issue of Fact I and II,* 34 Colum. L.Rev. 1224, 1252, 1462 (1934); Jerome Michael

and Mortimer Adler, *The Nature of Judicial Proof* (Colum. L. School 1931); James Bradley Thayer, *Select Cases on Evidence at the Common Law* (1892). Evidence has "probative value" only if it has any tendency to establish or disestablish a legally necessary (material) proposition in the case through proof of the probability that the proposition is true (or untrue). *See* Berger, *supra*, ¶ 401; *see also Epoch Producing Corp. v. Killiam Shows*, 522 F.2d 737, 744 (2d. Cir.1975) ("An inference will be upheld only if application of common experience and logic to the underlying evidence will support it."), *cert. denied*, 424 U.S. 955, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976).

The horn-book requirement for admitting evidence is based on the premise that jurors will evaluate evidence rationally, by applying it logically to one material proposition after another, in determining whether the elements of the cause of action have been proved to the requisite degree of probability. *See, e.g.*, Graham B. Strong, *The Lawyer's Left Hand; Non–Analytical Thought in the Practice of Law*, 69 U. Colo. L.Rev. 759, 788 n. 140 (1998) ("American law schools still teach predominantly through variants of the case method that [Christopher] Langdell popularized, and through that method focus principally upon the development of analytical thinking among their lawyers-in-training"); George F. James, *Relvancy, Probability and the Law*, 29 Cal. L.Rev. 689 (1941).

Traditional theory assumes that a jury will decide the relationship between the law and the facts of the case as if solving a puzzle in logic—viewing evidence in pieces and discretely evaluating their connection through formal principles. *See, e.g.*, Todd E. Pettys, *Evidentiary Relevance, Morally Reasonable Verdicts, and Jury Nullification*, 86 Iowa L.Rev. 467, 474–75 & ns. 31–36 (2001) (describing traditional views of relevance); Michael S. Prado, Comment, *Juridical Proof, Evidence, and Pragmatic Meaning: Toward Evidentiary Holism*, 95 Nw. U.L.Rev. 399, 400 (2000); John H. Wigmore, *Evidence In Trials At Common Law* § 28, at 969 (Peter Tillers ed., 1983); Jerome Michael & Mortimer Adler, *The Trial of an Issue of Fact: I and II*, 34 Colum.L.Rev. 1224, 1252, 1462 (1934); *see also U.S. v. Shonubi*, 895 F.Supp. 460, 483 (1995) (describing Michael and Adler's methodology as "a sequence of inferential steps ending in an estimate of the probability of a material (ultimate) fact"), *rev'd on other grounds*, 103 F.3d 1085 (2d Cir. 1997). This view is manifested in the way we assume jurors generally follow instructions and apply law to facts. *See, e.g.*, *Romano v. Oklahoma*, 512 U.S. 1, 13, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994) (assuming that jurors "followed" instructions which, by negative implication, allowed jurors to pay no attention to the fact that person before them for sentencing was already under a sentence of death); *Shannon v. United States*, 512 U.S. 573, 584–85 & n. 10, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994) (assuming that jurors considering insanity defense in violent crime case would follow instruction to disregard likely punishment, even if they harbored the mistaken view that accepting that defense would result in his immediate release). *Lockhart v. McCree*, 476 U.S. 162, 183, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) (noting "the jury's more traditional role of finding the facts and determining the guilt or innocence of a criminal defendant"); *see also* John H. Mansfield, Norman Abrams, and Margaret A. Berger, et al., *Cases and Materials on Evidence*, 3, 10–13 (9th Ed.1997) (diagram, and step-by-step theoretical analysis); Edmund M. Morgan, *Functions of a Judge and Jury in the Determination of Preliminary Questions of Fact*, 43 Harv. L.Rev. 165 (1929).

More recently philosophical, psychological, and trial advocacy literature, as well as studies of juries, suggest that jurors reason and process information not merely as Aristotlean logicians, but somewhat more holistically, in terms of stories they can relate to. *See, e.g.,* David E. Rumelhart, *Schemata and the Cognitive System.* 2 Handbook of Social Cognition 163 (1984) (philosophy); Willard Van Quine, *Word and Object* (1960) (philosophy); Nancy Pennington & Reid Hastie, *A Cognitive Model of Juror Decision Making: The Story Model,* 13 Cardozo L.Rev. 519 (1991) (social psychology); *see also* Nancy Pennington & Reid Hastie, *Evidence Evaluation in Complex Decision Making,* J. Personality and Soc. Psychol. 242 (1986) (social psychology); Trina L. Davis, *What Makes Juries Tune Into Scientific, Technical, Or Otherwise Boring Evidence,* American Law Institute, SE21 ALI–ABA 305 (1999) (trial advocacy) ("People listen for a story, expect a story, and learn better when a story is presented to them ... Always select a theme that has both emotional as well as analytical support ... Juries do not decide cases based purely on logic or on jury instructions"); Brenda Inman Rowe, *A Possible Solution For The Problem of Juries Slighting Non–Scientific Evidence: A Baysean–Like Judicial Instruction,* 24 Am. J.Crim. L. 541 (1997) (study reveals that some jurors are apt to undervalue non-scientific evidence absent instruction, when scientific and non-scientific evidence are presented together). This development suggests that evidence rules may be somewhat loosened in their application—subject to Rule 403 problems of prejudice—to admit evidence of the practical consequences of a verdict and to give jurors a larger world context in which to make their decisions. *See, e.g., Old Chief v. United States,* 519 U.S. 172, 187, 188, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) ("Evidence thus has force beyond any lin-

ear scheme of reasoning, and as its pieces come together a narrative gains momentum, with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict"); Richard D. Friedman, *Irrelevance Minimal Relevance, and Meta–Relevance,* 34 Hous. L.Rev. 55, 67–71 (1997) (dubbing such an admission principal "meta-relevance"); *Note, Considering "Jury Nullification". When May And Should A Jury Reject The Law To Do Justice,* 30 Am.Crim. L.Rev. 239 (1993) (recommending a less stringent relevancy test in some cases than the rigid and logical one in Rules 401, 402, and 403 of the Federal Rules of Evidence). The present tendency is to recognize that advocates place—and juries expect them to put—more flesh on the bare bones of traditional evidence-in-chief, which provide only a factual skeleton supporting a legal concept.

Yet, there are dangers in this more relaxed view. In *Old Chief,* for example, the more detailed criminal history of defendant there suggested presents a risk that the jury would reason that since the defendant who had previously been convicted of a serious crime was a bad person, he or she was more likely to have committed the bad act charged—a forbidden inference— or that it did not make as much difference if they convicted an innocent defendant because the defendant probably deserved punishment anyway. There is also the increased possibility that jurors fixed on story-telling will be less willing to responsibly address the precise substantive-legal-factual issues for which they were empaneled. A jury deliberation is not a coffee klatch.

The Supreme Court has wavered between expansive and restrictive interpretations of what constitutes relevant evidence. It has excluded contextual information that

"invites jurors to ponder matters that are not within their province, distracts them from their fact-finding responsibilities, and creates a strong possibility of confusion." *See, e.g., Shannon v. United States,* 512 U.S. 573, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994) (citing *Rogers v. United States,* 422 U.S. 35, 40, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975) (in federal court, a jury should be told that it has "no sentencing function and should reach its verdict without regard to what sentence might be imposed")). More recently, the Court has been somewhat receptive to evidence which "satisfies jurors' expectations about what proper proof should be" and recognizes that some evidence may be admitted to "tell a colorful story with descriptive richness." *Old Chief v. United States,* 519 U.S. at 187, 188, 117 S.Ct. 644; James Joseph Dunne, *Screw Your Courage to the Sticking Place: The Roles of Evidence, Stipulations and Jury Instructions in Criminal Verdicts,* 49 Hast. L.J. 463, 472–75 (1997) (describing conflict between *Old Chief* and *Shannon* ). Although evidence may lack relevance in the traditional sense, the Court noted its admissibility could correspond to a more pragmatic understanding of the way jurors process information. *Old Chief v. United States,* 519 U.S. at 187, 188, 117 S.Ct. 644 (forcing party to accept stipulation of evidence might unfairly saddle the case with "a story interrupted by gaps of abstraction."); *see also Lakeside v. Oregon,* 435 U.S. 333, 340 & n. 10, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978) (non-testifying accused may demand that a jury be instructed not to draw any adverse inferences from silence).

*Old Chief v. United States* has generated significant controversy. Some commentators have suggested that it lays the groundwork for introducing evidence as relevant even when it raises issues of consequences outside the courtroom. *See* Todd E. Pettys, *Evidentiary Relevance,*

*Morally Reasonable Verdicts, and Jury Nullification,* 86 Iowa L.Rev. at 467; Graham B. Strong, *The Lawyer's Left Hand: Non–Analytical Thought in the Practice of Law,* 69 U. Colo. L.Rev. 759, 788 n. 140 (1998) (stating *Old Chief* endorsed a concept of relevance that appears to go well beyond a narrow, rational model of relevance and incorporate what may be termed 'aesthetic considerations.'). At bottom, *Old Chief* suggests that evidentiary inquiries into relevancy should relate to the way people learn and should permit jurors to "draw inferences, whatever they may be, necessary to reach a correct verdict." *Old Chief v. United States,* 519 U.S. at 187, 188, 117 S.Ct. 644.

The Federal Rules, for similar reasons, assume leeway in the introduction of demonstrative and background evidence. The Advisory Committee notes to Rule 401 of the Federal Rules of Evidence approves some looseness. It reads:

> Evidence which is essentially background in nature can scarcely be said to involve disputed matter, yet it is universally offered and admitted as an aid to understanding. Charts, photographs, views of real estate, murder weapons, and many other items of evidence fall into this category. A rule limiting admissibility to evidence directed to a controversial point would invite the exclusion of this helpful evidence, or at least the raising of endless questions over its admission.

Fed R. Evid. 401 advisory committee's note; *see also* Berger, *Evidence, supra* ¶ 401[405] ("Evidence that serves as background information about persons, subjects, or things in a trial is generally admissible although it may not relate to a consequential fact."); John H Mansfield, Norman Abrahams, and Margaret Berger et al., *Evidence Rules Statutes and Case Supplement* 23 (1998). Demonstrative evi-

dence—the use of charts, graphs, models to clarify other evidence used in a trial—has been a part of the American trial process for over a century. Yet, there is no developed theory explaining the relevance of such evidence under a rigid analysis of Federal Rules 401 to 403. *See* Robert D. Brain & Daniel J. Broderick, *The Derivative Relevance of Demonstrative Evidence: Charting its Proper Evidentiary Status*, 25 U.C. Davis. L.Rev. 957, 962 (1992). "Demonstratives" have been recognized as having a "secondary" or "derivative" function at trial—serving to explain or clarify previously introduced, relevant substantive evidence. Robert D. Brain & Daniel J. Broderick, *The Derivative Relevance of Demonstrative Evidence; Charting its Proper Evidentiary Status*, 25 U.C. Davis. L.Rev. at 962 ("Contemporary jurists and lawyers continue to share the historical vision that demonstrative proof can be used at trial as a natural right."). The increasing sophistication of such explicative information—with the advent of powerful computers, graphic software, video depositions, and digital three dimensional reconstructions of scenes in motion—demonstrates the importance attorneys place, and the latitude courts have granted, in presenting information to juries in non-analytical ways. In the present case there are hundreds of state-of-the-art demonstratives shown to the jury on a ten-foot screen and through colorful placards with various forms of graphics and other methods of presenting data and argument.

A less obvious form of non-admitted evidence available under the Rules is a juror's "background" knowledge. *See* Richard M. Fraher, *Adjudicative Facts, and Permissible Jury Background Information*, 62 Ind. I.J. 333 (1987). Every juror brings values and information into a courtroom, that shapes how the evidence will be interpreted. *See, e.g.,* Peter Tillers, *Webs of Things in the Mind: A New Science of Evidence,* 87 Mich.L.Rev. 1225, 1226 (1989) ("[T]heory of relevancy and inference ... put [s] great emphasis on the role of experience and on generalizations based on experience."). The Federal Rules attempt to screen out some of this "non-relevant" information, but recognize that jurors must come into the courtroom with enough experience to provide the hypotheses from real life necessary to decide issues of fact. *See, e.g., Bibbins v. Dalsheim,* 21 F.3d 13, 17 (2d Cir.1994) (juror's information was insufficiently prejudicial and simply part of "the fund of ordinary experience that jurors may bring to the jury room and may rely upon," such as the fact that "Times Square is busy all night."); Berger, *Evidence* ¶ 606.04[5][b] ("Jurors are expected to bring commonly known facts to bear in assessing the facts presented for their consideration"); *cf.* Stephen A. Saltzburg,*A Special Aspect of Relevance: Countering Negative Inferences Associated with the Absence of Evidence,* 66 Cal. L.Rev. 1011, 1019 (1978) ("If expectations are not satisfied ...").

At the outset of the trial potential jurors can be excluded for cause if they possess background knowledge or beliefs that are particularly relevant to the issues or parties in the case and this mental baggage presents a serious risk that they will not be able to evaluate the evidence at the trial fairly, or that, with their specialized knowledge, they may intimidate or mislead other jurors.

There is no clear rule defining what is or is not permissible background information. *See, e.g.,* John H. Mansfield, *Jury Notice,* 74 Geo.L.J. 395 (1985) ("Surprisingly little attention has been given in decisions and commentary to the question of what information not formally introduced into evidence a jury may use as background information for the purpose of

drawing inferences."). It is evident, however, that the juror's background experience is essential to the adjudicative process. Berger, *Evidence* ¶ 401[409] ("So long as a juror might rationally have his assessment of probabilities affected by proffered evidence that evidence is relevant ... That does not mean the jurors are acting irrationally or emotionally, but only that they are utilizing their own experience to supply and evaluate appropriate hypotheses of proof"); Richard M. Fraher, *Adjudicative Facts, and Permissible Jury Background Information*, 62 Ind. I.J. at 333 ("The cases and the legal literature are replete with paens to the jury, even in its lawlessness, as a repository of "common sense equities" ").

Consideration of these pragmatic factors in decision-making suggests that there are occasions for admitting evidence not in accord with rigid standards of Rule 401 relevance. This includes times when admitting evidence is necessary as a "preemptive measure"—revealing information that jurors should not consider, but inevitably will because of their background knowledge and prejudices, and then reducing its sting with an appropriate legal instruction. Fed.R.Evid. 105; *see also* Berger, *Evidence* § 107.02 (discussing Supreme Court Standard Rule 107 which permits judicial comment on evidence); David Crump, *On The Uses Of Irrelevant Evidence*, 34 Hous. L.Rev. 1, 45 (1997) ("it may make sense in appropriate instances to receive otherwise immaterial evidence for the limited purpose of demonstrating its irrelevance"); Jody Armour, *Stereotypes and Prejudice: Helping Legal Decisionmakers Break the Prejudice Habit*, 83 Cal. L.Rev. 733, 734–35 (1995) (suggesting a similar procedure to mitigate racial bias). Preemptively exposing such evidence has the benefit of discouraging jurors from making subrosa determinations about the propriety of a penalty or damage award, and encouraging them to determine facts responsibly within the law as charged. *Note, The Power and Duty of Federal Judges to Marshall and Comment on the Evidence in Jury Trials and Some Suggestions on Charging Juries*, 118 F.R.D. 161, 166 (1986) ("[A] judge's summary and comment on the evidence can increase the jury's ability to understand the proceedings it has attended, and thus increase the accuracy of verdicts."); Alexander Holtzhoff, *The Right of a Judge to Comment on the Evidence in his Charge to the Jury*, 6 F.R.D. 317, 323 (1947) ("[A judge's] comments are ... intended to place the various items of evidence in their proper setting and in their correct proportions, rather than leave them in the distorted shape which sometimes they assume as a result of partisan presentation by counsel").

■ Curative instructions are not foolproof. Admission of peripheral evidence must be balanced against time concerns and risks of undue prejudice under Rule 403. *See* Fed.R.Evid. 105, 403; *Bruton v. United States*, 389 U.S. 818, 88 S.Ct. 126, 19 L.Ed.2d 70 (1967) (limiting instruction did not effectively protect accused); *Nash v. United States*, 54 F.2d 1006, 1007 (2d Cir.1932) (Hand, J.) (describing instructions as "recommendation[s] to the jury of a mental gymnastic which is beyond, not only their powers, but anybody's else"); *Note, Considering Jury "Nullification": When May and Should a Jury Reject the Law to Do Justice*, 30 Am.Crim. L.Rev. 239, 250–51 (1993) (opposing jury instructions against nullification because giving such an instruction "is like telling children not to put beans in their noses"—the jury might not have thought of it otherwise, and should nullify only when driven to do so by the force of their consciences); Tanford & Cox, *The Effects of Impeachment Evidence and Limiting Instructions on*

*Individual and Group Decision Making,* 12 Law & Hum. Behav. 477 (1988); Wissler & Saks, *On the Inefficacy of Limiting Instructions: When Jurors Use . Prior Conviction Evidence to Decide on Guilt,* 9 Law & Hum. Behav. 37 (1986).

Given the sophistication of the evidence presented, erring on the side of openness is often needed in complex cases with strong public policy concerns. Federal Judicial Center, Manual for Complex Litigation § 22.433 (2000) (importance in using interim instructions to focus jury on what it must decide and how decisions are reached); *Note, Considering Jury Nullification: When May Jurors Reject the Law To Do Justice,* 30 Am.Crim. L.Rev. at 244–45 ("There are useful things that a court can say ... Although we can trust jurors to make accurate assessments of credibility ... most jurors have not encountered situations when so much is at stake"); J. Cecil, E. Lind, & G. Barmant, *Jury Service in Lengthy Civil Trials* 39, Federal Judicial Center (1987) (discussing difficulty jurors have in understanding technical information in complex antitrust litigation); *Cf.* Warren Burger, *Can Jures Cope With Multimonth Trials?,* 3 American Journal of Trial Advocacy 448 (1980) (arguing for abandoning lay jury in complex cases given sophistication of the testimony).

### B. *Application*

This is a difficult and significant case. It will last forty to fifty trial days with scores of expert and lay witnesses, many statistical studies, and thousands of documents. Each juror, despite an exhaustive voir dire by questionnaire and oral examination to eliminate those with prejudicial preconceptions, will have some pretrial view on health care, insurance, and the tobacco industry. Inevitably, some will entertain views that the insurance companies are able to recoup their costs through increasing premiums—and, in turn, this information may skew calculations of liability and damages. Although outside the traditional scope of relevancy, admitting evidence of pass on in the form of higher premiums and pass back through future lower premiums to dispel them as factors to be considered during deliberation is likely to have the positive effect of ensuring that the jury makes lawful findings, without conscious or unconscious formulations distorting the verdict. A charge on their irrelevance in deciding damages will be given. Having observed this responsible and dedicated jury during selection and over some fifteen trial days, the court is convinced that in this case the benefits of the proposed course outweigh its risks.

It is, of course, remotely possible that none of the jurors may have considered these economic possibilities until they were raised in the courtroom. The introduction of evidence, along with an explanatory juror charge could possibly prejudice the parties. Notwithstanding, the public import and sophistication of this case—including technical descriptions of medical causation, damage models, and other statistical evidence presented by many experts—suggest that it is best to err on the side of openness. Limited descriptions of how the health, tobacco, and insurance industries work, accompanied by proper legal instructions, should ultimately assist the trier of fact in making a proper judgment according to the substantive law governing the case.

### IV. Conclusion

The classical way of approaching courtroom problems, procedurally and evidentially, is to proceed step-by-step, proposition by proposition, to establish by sharply limited relevant evidence whether each material proposition has been proven. The courts now take a broader view of

what the trier of fact will do, even though the charge books properly continue to emphasize elements of a criminal or civil cause of action. The instant action involves a conflict between two huge, complex industries—tobacco and insurance. To decide, each of the jurors must have a sense of how these industries operate in order to avoid egregious errors and to permit a more accurate assessment of the facts in issue.

Plaintiff's motion is denied in part and granted in part.

SO ORDERED